**LAND O'LAKES, INC., formerly Land O'Lakes Creameries, Inc., a Minnesota corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 3–71–Civ–49.**

United States District Court,
D. Minnesota,
Third Division.

Sept. 11, 1973.

Doherty, Rumble & Butler, Harold Jordan, and Irving Clark, St. Paul, Minn., for plaintiff.

Robert G. Renner, U. S. Atty., Scott P. Crampton, Asst. Atty. Gen., Daniel J. Dinan, D. Patrick Mullarkey, and John A. Flanagan, Attys., Dept. of Justice, for defendant.

## MEMORANDUM AND ORDER

DEVITT, Judge.

In this civil tax refund action to recover $254,978.74 of income tax and interest paid for the calendar year 1963, the principal issue is whether plaintiff violated § 521 of the Internal Revenue Code of 1954 and thus lost its qualification as a tax exempt organization. If the Court finds Land O'Lakes did not qualify as a tax exempt organization for the year 1963, then numerous secondary issues which relate to deductions disallowed by the government must also be resolved. If the Court finds that Land O'Lakes did qualify as a tax exempt organization for the year 1963, then only one secondary issue which relates to deductibility must be resolved.

Land O'Lakes, Inc., a Minnesota corporation, is a farmers' cooperative which qualified as a tax exempt organization under § 521 of the Code from 1923 through 1962. On February 9, 1970, the Internal Revenue Service notified Land O'Lakes by letter that the exemption of the farmers' cooperative was revoked effective with the calendar year 1963. On October 1, 1970, the I.R.S. notified Land O'Lakes of a proposed assessment of an alleged deficiency in income tax for the calendar year 1963 in the amount of $186,393.57. On November 2, 1970, Land O'Lakes paid the alleged deficiency plus interest of $68,585.17 for a total of $254,978.74 and filed a claim for refund. On December 30, 1970, the I.R.S. notified Land O'Lakes that its claim for refund was disallowed. Plaintiff instituted this action for refund on March 5, 1971.

The matter was tried to the Court on June 19 and 20, 1973. The parties stipulated to most of the facts. Briefs have been filed. Jurisdiction rests on 28 U.S.C. § 1346.

The organizational structure of Land O'Lakes may be separated into two activities: (1) marketing activities and (2) supply activities. The marketing activities of Land O'Lakes were conducted by both retail and wholesale methods. The major portion of plaintiff's retail sales in 1963 was accomplished by Bridgeman Division. Bridgeman Division marketed both producer goods (dairy items) and nonproducer goods (nondairy items) at retail. The dairy items were supplied to Land O'Lakes by member-cooperatives and individual member-farmers (producers). The nondairy items were supplied to Land O'Lakes by proprietary companies (non-

producers). The major portion of Land O'Lakes' marketing activities in 1963 was accomplished by the wholesale method. In addition to marketing producer goods at wholesale, Land O'Lakes also marketed nonproducer goods at wholesale which were obtained from Northwest Dairy Products Company, Inc., a wholly-owned subsidiary. Northwest, a nonproducer, purchased the nonproducer goods from proprietary companies and sold the goods to plaintiff at cost. The supply activities of Land O'Lakes consisted of selling agricultural supplies to member-cooperatives, company stores, independent dealers, and agent-buyers who in turn resold the supplies to members and other patrons. The agent-buyer, a nonmember nonproducer, was used in geographical areas where Land O'Lakes did not have a member-cooperative or company store. Unlike the independent dealer, the agent-buyer executed an agreement with Land O'Lakes in which he agreed to provide the cooperative with all invoices based on sales of supplies to producers. At the end of each year, plaintiff distributed patronage dividends to all producers who purchased supplies from the agent-buyer as reflected by the invoices. The agent-buyer received patronage dividends attributable to purchases of supplies by nonproducers or by the agent-buyer himself.

The basic issue is whether Land O'Lakes was properly operating under the Internal Revenue Code as a tax exempt farmers' cooperative in 1963. To resolve this issue, the Court must analyze three sub-issues which involve the marketing and supply activities of Land O'Lakes. If the Court finds in favor of the government with regard to any one of the three sub-issues, then it must be concluded that plaintiff was improperly operating as a tax exempt organization for the calendar year 1963.

The first sub-issue is whether Land O'Lakes violated § 521(b)(1)(A) of the Code by marketing nonproducer goods at retail through its Bridgeman Division. Section 521(b)(1)(A) provides that "farmers' cooperatives exempt from taxation to the extent provided in subsection (a) are farmers', fruit growers', or like associations organized and operated on a cooperative basis (A) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them."

Neither the Code nor the Treasury Regulations promulgated thereunder make reference to the marketing of nonproducer goods by exempt farmers' cooperatives. The courts have held that tax exemption statutes should. be strictly construed against the taxpayer. *See, e. g.,* Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29 (1940); Co-operative Grain & Supply Co. v. Commissioner of Internal Revenue, 407 F.2d 1158 (8th Cir. 1969). However, there is also authority for the general proposition that tax exempt organizations may engage in certain "incidental activity which standing alone would be subject to taxation." United States v. Omaha Live Stock Traders Exch., 366 F.2d 749, 752 (8th Cir. 1966), *quoting* Evanston-North Shore Bd. of Realtors v. United States, 162 Ct.Cl. 682, 320 F.2d 375, 380 (1963). *See also* Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924) (exempt religious organization); Eugene Fruit Growers Ass'n v. Commissioner of Internal Revenue, 37 B.T.A. 993 (1938) (exempt farmers' cooperative).

More specifically, the I.R.S. has ruled that an exempt farmers' cooperative may market nonproducer goods in two limited situations. The first exception allows an exempt farmers' cooperative to market nonproducer goods in an emergency situation when necessary to fulfill outstanding orders based on pre-existing contractual commitments to facilitate dealings with member-patrons. Rev.Rul. 69–222, 1969–1 Cum.Bull. 161. This exception is not applicable here. The sec-

ond exception allows an exempt farmers' cooperative to market nonproducer goods at retail if such goods are necessary to the effective marketing of producer goods. However, this exception is further limited by the requirement that the marketing of such nonproducer goods which are deemed "necessary" may not exceed five percent of the total retail sales unless the cooperative establishes that the total sales of nonproducer goods are "merely incidental" to the total sales of producer goods. Thus, if the sales of nonproducer goods are so substantial that they cannot be considered as merely incidental, the question of whether the nonproducer sales are a "necessary supplement" to the effective marketing of producer goods is immaterial because the cooperative has violated the Code provisions governing its exempt status. Rev.Proc. 67–37, 1967–2 Cum.Bull. 668. This exception is applicable to the retail marketing of nonproducer goods by Bridgeman Division.

Land O'Lakes argues that Bridgeman's marketing of nonproducer goods at retail was incidental to the marketing of producer goods at retail and was for the purpose of selling the producer goods more advantageously. In an attempt to prove its sales of nonproducer goods were incidental to its sales of producer goods, Land O'Lakes proposes three standards of measurement: (1) total sales of nonproducer goods at wholesale and retail measured against total sales at wholesale and retail, (2) total sales of nonproducer "soft" goods (non-dairy items marketed by Bridgeman) measured against total sales of soft goods (dairy and non-dairy items marketed by Bridgeman Division and Land O'Lakes Fluid Milk and Ice Cream Division), or (3) total sales of nonproducer soft goods measured against total sales of soft goods by Bridgeman only. Regardless of the standard of measurement employed, plaintiff asserts that it is unimportant upon which basis the percentage of nonproducer goods is computed because the important question is whether or not the nonproducer goods were mar-

keted for the purpose of more advantageously selling the producer goods.

Land O'Lakes further argues that nonproducer goods were introduced in an attempt to turn losses incurred by Bridgeman into profits by attracting more customers who would purchase more producer goods. It is concluded that the availability of the nonproducer goods in 1963 did effect a substantial profit on the sale of producer items even though Bridgeman incurred a loss on the sale of nonproducer items. Given this motivation, Land O'Lakes states that the incidental marketing of nonproducer goods by Bridgeman and resulting profits made on the marketing of producer goods support its argument that the purpose of this activity was to enhance the sales of producer items and was not in violation of § 521(b)(1)(A).

The government argues that the marketing of nonproducer goods at retail was not incidental and was not proven by plaintiff to be necessary. In reliance on the Revenue Procedure explained above, the government states that the standard of measurement employed to determine the percentage of nonproducer goods marketed by Bridgeman should be the total retail sales of nonproducer goods measured against the total retail sales of the marketing activity. Applying this standard to Bridgeman's marketing activity, the government computes that Land O'Lakes' total retail sales of nonproducer goods in 1963 were seventeen percent of the total retail sales of the marketing activity. Therefore, the government reasons, assuming that the nonproducer retail sales were "necessary" in accordance with the guidelines of the Revenue Procedure, the percentage of such sales was too substantial to be considered "merely incidental" in light of the five percent limitation imposed by the Revenue Procedure. In the alternative, the government asserts that even if the sales of nonproducer goods at retail were found by the Court to be incidental, plaintiff failed to prove that such sales were necessary to the effective marketing of producer goods.

The issue of whether or not a farmers' cooperative exempt from tax under § 521 may market nonproducer goods at retail has not been decided by any court. However, the 1967 Revenue Procedure relied upon by the government does provide guidelines under which a farmers' cooperative may market nonproducer goods at retail to a limited extent. The Revenue Procedure also provides that "where sales of nonproducer sideline items exceed five percent, a determination whether the sales constitute a necessary supplement to the efficient marketing of producer items will be made *on the basis of all the facts and circumstances in the particular case.*" Rev. Proc. 67–37, *supra* (emphasis added).

On the facts here, I find that the retail marketing of nonproducer goods by Land O'Lakes during 1963 was incidental to the effective marketing of producer goods and did not violate § 521(b)(1)(A) of the Code. Whether the introduction and marketing of nonproducer goods resulted in a profit in and of itself is not the determinative factor. The sum of the evidence offered by both parties was not indicative of a *separate* profit motive on the part of Land O'Lakes. On the contrary, the evidence was that the introduction of nonproducer goods by Bridgeman was for the purpose of attracting more retail customers in order to sell more producer goods.

Furthermore, the volume of nonproducer goods marketed was incidental to the total volume of retail goods marketed. The Court does not arrive at this conclusion solely by the computation of the percentage of nonproducer goods marketed at retail measured against total retail goods marketed but rather by determining the *purpose* for which the non-exempt activity was conducted, *i. e.*, to enhance the sales of producer goods. *See* Eugene Fruit Growers Ass'n v. Commissioner of Internal Revenue, 37 B.T.A. 993, 1001 (1938). This purpose is in harmony with the apparent intent of the Congress in granting tax exemption to farmers' cooperatives. Although

an excessive percentage of non-exempt activity in any given year may cause a farmers' cooperative to forfeit its exempt status, the facts here support the conclusion that plaintiff's retail marketing of nonproducer goods in 1963 was incidental to the main purpose of selling producer goods more advantageously.

The second sub-issue is whether Land O'Lakes violated § 521(b)(1)(A) by the marketing of nonproducer goods at wholesale. As explained above, Northwest, Land O'Lakes' wholly-owned subsidiary, purchased nonproducer goods from proprietary companies and resold the goods to plaintiff at cost pursuant to a written contract. Land O'Lakes would then market the nonproducer goods at wholesale and distribute the earnings to the subsidiary in accordance with the contract. The subsidiary was obligated to return the earnings to Land O'Lakes which in turn redistributed them to its members and other producers in the subsequent year.

The Code and the Treasury Regulations do not specifically authorize the marketing of nonproducer goods by exempt farmers' cooperatives. Nevertheless, the I.R.S. has recognized two limited exceptions to this congressional and administrative silence as noted above, *i. e.*, the marketing of nonproducer goods in certain emergency situations (Rev. Rul. 69–222, *supra*) and the marketing of nonproducer goods at retail within certain guidelines (Rev.Proc. 67–37, *supra*); however, the recognition by the I.R.S. of limited retail marketing of nonproducer goods has not been extended to the marketing of nonproducer goods at wholesale.

Land O'Lakes argues that the wholesale marketing of nonproducer goods purchased from Northwest was incidental in relation to the total volume of goods marketed and was necessary for the purpose of more advantageously selling producer goods. Specifically, plaintiff states that the nonproducer goods procured by the subsidiary and resold to the parent were the same products as those marketed for the members and

other producers and that any profit derived from this activity was properly redistributed to the cooperative's members and other producers. It is argued that the cooperative could have purchased the nonproducer goods directly from the proprietary companies, *i. e.*, avoiding the use of Northwest as a middleman, and distributed the profits to members and other producers without violating § 521(b)(1)(A). Land O'Lakes asserts that it was required under its Articles of Incorporation and By-Laws to distribute profits derived from the purchase of products to each individual or entity from which it purchased the products. Thus, it is reasoned that the use of Northwest was simply a method employed in order to comply with this provision of the Articles and By-Laws and still be able to distribute the profits to the members and other producers rather than to the proprietary companies with which it was dealing. Since the marketing of wholesale nonproducer goods was allegedly consistent with the intent of § 521(b)(1)(A), Land O'Lakes contends that the use of the subsidiary to satisfy a provision of the cooperative's Articles and By-Laws does not alter the legality of the sales.

The government argues that the wholesale marketing of nonproducer goods by cooperatives is not specifically provided for by the Code or Regulations. Furthermore, the I.R.S. has not set forth any exception which authorizes the marketing of an incidental amount of nonproducer goods at wholesale as it has in the case of nonproducer goods marketed at retail. The government reasons that while it may be necessary for a cooperative to market a limited amount of nonproducer goods at retail in order to attract the individual customer to buy producer goods, the same rationale is not applicable to the wholesale marketing of nonproducer goods because the typical wholesale customer (*e. g.*, a large grocery store chain) could purchase nonproducer goods from another supplier and still continue to buy producer goods at wholesale from the cooperative.

Therefore, it is urged the standard applied to the wholesale marketing of nonproducer goods should be considerably more strict than the standard applied to the retail marketing of nonproducer goods. The government concludes that plaintiff has not established that the marketing of nonproducer goods at wholesale was necessary to the effective marketing of producer goods at wholesale.

Although there is no statutory, judicial, or administrative position specifically authorizing the wholesale marketing of nonproducer goods by a farmers' cooperative, the Court finds that the evidence offered by Land O'Lakes with regard to the purchases from its subsidiary establishes that the activity was in accord with the apparent congressional intent which underlies § 521(b)(1)(A). We are not persuaded that the distinction between a cooperative's wholesale and retail marketing activities is properly characterized by the government.

In 1963 plaintiff's wholesale marketing of nonproducer goods was approximately 3.4 percent of the total marketing of wholesale goods. Nonproducer goods were obtained through the subsidiary for two purposes: (1) for use by a cheese packaging plant owned by Land O'Lakes during a transition period in which there were not enough producer goods available to operate the plant efficiently; (2) for use in Land O'Lakes' branches to provide a full line of products for purchase by the wholesale customer. The percentage of nonproducer goods purchased through the subsidiary for use by the cheese packaging plant during the transition period declined significantly as Land O'Lakes was able to procure producer goods from members and other producers. The temporary use of nonproducer goods was incidental to the main purpose of the cooperative, *i. e.*, to promote the marketing of producer goods, and was for the purpose of aiding Land O'Lakes' exempt activity. *See, e. g.,* Commissioner of Internal Revenue v. Chicago Graphic Arts Federation, 128 F.2d 424 (7th Cir. 1942)

(business league exempt when non-exempt activity was temporary and for purpose of aiding exempt activity). Similarly, the nonproducer goods purchased through Northwest for use in the branches were incidental to the main purpose of the cooperative. These nonproducer goods were marketed to provide a full line of products for the wholesale customer (*e. g.*, grocery chains and restaurants) so that the cooperative could more advantageously sell the producer goods. Therefore, the Court finds that the wholesale marketing of nonproducer goods purchased through Northwest was incidental and subordinate to the total wholesale marketing activity of plaintiff during 1963 and was in furtherance of the cooperative's main purpose of enhancing the marketing of producer goods. This finding comports with the apparent intent of Congress in enacting § 521(b)(1)(A).

■ The third sub-issue is whether Land O'Lakes violated § 521(b)(4) by purchasing supplies for nonmember nonproducers in excess of fifteen percent of the value of all its purchases in 1963 and/or violated §§ 521(b)(1)(B), 1382, or 1388 by the payment of patronage dividends to the producer-customers of the agent-buyers rather than to the agent-buyers themselves. Section 521(b)(4) provides in part that "[e]xemption shall not be denied any such association [farmers' cooperative] . . . which purchases supplies and equipment for nonmembers in an amount the value of which does not exceed the value of supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 percent of the value of all its purchases." The issue is whether the agent-buyers were agents of the producer-customers or independent entrepeneurs. If the agent-buyers are found to be agents of the producer-customers, then Land O'Lakes did not violate § 521(b)(4) by purchasing supplies for nonmember nonproducers in excess of fifteen percent of the value of all its

purchases for 1963. Conversely, if the agent-buyers are found to be independent entrepeneurs, then Land O'Lakes' total supply activities for nonmember nonproducers exceeded the fifteen percent limitation.

Section 521(b)(1)(B) provides that "farmers' cooperatives exempt from taxation to the extent provided in subsection (a) are farmers', fruit growers', or like associations organized and operated on a cooperative basis . . . (B) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses." Sections 1382 and 1388 were enacted as part of the Internal Revenue Act of 1962. Although a farmers' cooperative must comply with requirements of § 521 to be exempt from tax, an exempt or nonexempt cooperative may nevertheless be subject to taxation if it does not comply with requirements of §§ 1382 and 1388. Also, the requirements of §§ 1382 and 1388 may affect the statutory construction of the exemption requirements of § 521. As it relates to patronage, § 521 requires that a cooperative distribute patronage dividends (net margins) equally between member-patrons and nonmember-patrons. Sections 1382 and 1388 provide additional guidelines governing the method of distributing patronage dividends. Section 1382(b) authorizes both exempt and non-exempt cooperatives to deduct patronage dividends if distributed in the manner prescribed. Section 1382(c) authorizes only exempt cooperatives to deduct nonpatronage distributions if distributed in the manner prescribed. Section 1388(a) defines the term "patronage dividend" for purposes of the deduction. *See generally* Clark & Warlich, Taxation of Cooperatives: A Problem Solved? 47 Minn.L.Rev. 997 (1963). Thus, if the Court finds that Land O'Lakes did not violate the fifteen percent limitation on purchases for nonmember nonproducers, it must further determine whether the payment of patronage dividends to the producer-cus-

tomers rather than to the agent-buyer was in violation of §§ 521, 1382, or 1388. Finally, even if the payment of patronage dividends to the producer-customers is found to be proper, the Court must decide whether the products were supplied to the producer-customers "at actual cost, plus necessary expenses" under § 521(b)(1)(B).

Land O'Lakes explains that under a written agreement between the agent-buyer and the cooperative supplies were sold to the agent-buyer at wholesale in the same manner as supplies sold to an independent dealer. The agent-buyer would then sell the supplies to the producer-customers at the same competitive retail price as used by the independent dealer. However, unlike the arrangement with an independent dealer, the agreement required that the agent-buyer forego his right to receive the patronage dividends as a result of dealing with Land O'Lakes on a cooperative basis and allow such dividends to be passed on to the producer-customers.

Plaintiff cites various sections of the Restatement of Agency in an attempt to support its argument that the agent-buyer was acting as an agent for the producer-customers in accordance with the agreement. It is argued that the agent-buyer is the agent of the producer-customers because he has agreed to act "primarily for the benefit" of the producer-customers and not for his own benefit. Restatement (Second) of Agency § 14K (1957). Land O'Lakes contends that the "primary benefit" is the patronage dividend which the agent-buyer is obligated under the agreement to pass on to the producer-customers. There is no principal at the time the agent-buyer purchases the supplies from the cooperative on behalf of the producer-customers, but Land O'Lakes submits that the agency relationship is ratified at the time the agent-buyer furnishes the cooperative with the receipts of the sales signed by the principals (producer-customers). *See* Restatement (Second) of Agency § 85 (1957). Therefore, since the supplies

purchased by the agent-buyers were not made for "persons who were neither members nor producers," plaintiff asserts that it did not violate § 521(b)(4) by exceeding the fifteen percent limitation.

With regard to the payment of patronage dividends, Land O'Lakes states that "the government takes the position that plaintiff's distribution" of the patronage dividends to the members and other producers "would not, standing alone, be cause for losing its exemption" under any of the three sub-issues discussed above. Post-Trial Brief for Plaintiff at 2. Land O'Lakes further states that "[a]ccording to our understanding of the government's position, there is no issue as to patronage under Section 521(b) but there is an issue of patronage under Sections 1382 and 1388" of the Code. Post-Trial Brief for Plaintiff at 12. However, as noted below, the government does allege that the payment of patronage dividends to the producer-customers of the agent-buyers was in violation of § 521(b)(1)(B) and therefore deprived the cooperative of its exempt status. *See* Post-Trial Brief for Defendant at 44–46.

Assuming the agent-buyer is the agent of the producer customers, plaintiff contends that the distribution of patronage dividends to the producer-customer, in compliance with the contractual obligations between the cooperative and the agent-buyer, was proper in light of the guidelines of §§ 1382 and 1388 governing the method of patronage dividend distribution. Treasury Regulation § 1.1388–1(e) defines a "patron" as "any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association. . . ." Since both parties agree that the distribution of patronage dividends complied with the other requirements of §§ 1382 and 1388, Land O'Lakes argues that the producer-customer was the true patron within the definition of Treasury Regulation 1.-1388–1(e) and that the transactions

which included supplies purchased by the agent-buyers from plaintiff and sold to the producer-customer constituted "business done . . . for such patron," i. e., the producer-customer. Therefore, it is argued that Land O'Lakes' payment of patronage dividends under the agent-buyer agreement did not violate §§ 1382 and 1388 and was consistent with the exemption requirement of § 521.

In addition, plaintiff asserts that the products obtained by the agent-buyers from the cooperative were sold to the producer-customers "at actual cost, plus necessary expenses." The cooperative reasons that on the basis of evidence submitted the cost to the producer-customers who purchased products from the company stores was the same as the cost to the producer-customers who purchased products from the agent-buyer. Moreover, any profit made by the agent-buyer could justifiably be categorized as a "necessary expense" due to the fact that the agent-buyers were located in convenient places to supplement the lack of company stores. Thus, Land O'Lakes concludes that the expenses to the producer-customers were in compliance with the requirement of § 521(b)(1)(B) that the supplies be furnished "at actual cost, plus necessary expenses."

The government maintains, on the other hand, that the agent-buyer was an independent entrepeneur acting on his own behalf and not as agent for the producer-customer. It asserts that the agency rationale proposed by Land O'Lakes was merely a system devised by the cooperative to avoid the fifteen percent limitation imposed by § 521(b)(4). Therefore, the government claims plaintiff violated its tax exempt status and should be held to lose its exemption.

In addition, it is contended that even if Land O'Lakes did not exceed the fifteen percent limitation, the cooperative was still in violation of § 521 because it distributed patronage dividends to the producer-customer based on the proceeds of sales to the agent-buyer rather than the proceeds of sales to the producer-customers. Since § 521 contemplates the computation of the proceeds based on sales to the agent-buyer, the government reasons that the agent-buyer is the patron and that any distribution of patronage dividends to other persons, e. g., producer-customers, was in violation of the statute.

Moreover, the government states that even if the producer-customers were found to be the patrons, plaintiff still violated § 521(b)(4) because the supplies were not purchased by the producer-customers "at actual cost, plus necessary expenses." The government reasons that any profit made by the agent-buyer raised the purchase price paid by the producer-customer and that the purchases by the producer-customer were in excess of "actual cost, plus necessary expenses."

Whether an exempt farmers' cooperative's use of an agent-buyer to sell supplies to producer-customers violates the fifteen percent limitation under § 521(b)(4) concerning purchases from nonmember nonproducers has not been judicially decided. Plaintiff's reliance on agency principles to support its argument that the agent-buyer was acting in a fiduciary capacity on behalf of the producer-customers appears to be a strained legal position, but the Court believes the contract between Land O'Lakes and the agent-buyers was a permissible arrangement and not violative of the statute. The evidence established that the use of the agent-buyer was necessitated by a lack of other facilities to adequately provide for the supply needs of the producer-customers. The government has not made any showing that the agent-buyers breached the contract or acted in any manner contrary to the intended purpose of the arrangement to supplement the lack of supply outlets for the benefit of the producer-customers. The Court concludes that the purchases made for "persons who are neither mem-

bers nor producers" did not exceed fifteen percent of the value of all Land O'Lakes' purchases for the calendar year 1963 and that the use of the agent-buyer was permissible.

■ To determine whether or not the payment of patronage dividends to the producer-customers complied with the Code, the Court must construe the exemption requirements of § 521 in light of the statutory language found in §§ 1382 and 1388. This construction depends upon the definitions of the terms "patron" and "patronage dividend." A patron is a person "with whom or *for whom*" a cooperative does business on a cooperative basis. Treas.Reg. § 1.1388–1(e) (emphasis added). The Court finds that the producers-customers who purchased supplies from the agent-buyers were the true patrons "for whom" the cooperative was conducting business on a cooperative basis. A patronage dividend is "an amount paid to a patron . . . on the basis of quantity or value of business done with or *for* such patron." Int.Rev.Code of 1954, § 1388(a)(1) (emphasis added). The Court finds that the amounts paid to the producer-customers were patronage dividends based on "business done . . . *for* such patron." Since the distributions of net margins to the producer-customers was in accord with the definitions of "patron" and "patronage dividend" as set forth by the Code and Treasury Regulations, the Court concludes that Land O'Lakes did not violate the exemption requirement of § 521 and thus, for purposes of this issue, was operating as an exempt farmers' cooperative in 1963.

■ The Court also finds that the supplies purchased by the producer-customers were sold "at actual cost, plus necessary expenses" in compliance with § 521(b)(1)(B) because any profits accruing to the agent-buyers on the sales of supplies to producer-customers properly may be termed "necessary expenses" within the meaning of that statutory phrase. The evidence supports the conclusion that the cost to the producer-customers would be about the same whether made from the agent-buyers of the company stores. Thus, Land O'Lakes was operating within the requirement of § 521(b)(1)(B) which requires such purchases to be "at actual cost, plus necessary expenses."

In summary, the Court finds that the marketing and supply activities of Land O'Lakes for the calendar year 1963 were not in violation of § 521 of the Code and that plaintiff was therefore properly operating as a tax exempt farmers' cooperative during that year. Although the Court has found that Land O'Lakes complied with the exemption requirements of § 521, there still remains a secondary issue in dispute which relates to the deductibility of the dividends distributed by Land O'Lakes to Northwest.

■ The secondary issue is whether dividends paid by Land O'Lakes to Northwest based on earnings derived from the subsidiary's purchases of nonproducer goods are deductible under §§ 1382 and 1388. Plaintiff argues that the subsidiary was a separate corporate entity and should be considered the patron of the cooperative for purposes of §§ 1382 and 1388. In response, the government argues that the subsidiary was a sham and that under § 1382(b)(1) a cooperative may not distribute alleged patronage dividends to itself and then deduct that amount from its taxes. The Court finds that the subsidiary was a separate corporate entity and was the patron for purposes of §§ 1382 and 1388. The evidence establishes that the subsidiary did conduct a minimal amount of business in purchasing nonproducer goods from proprietary companies. As long as the purpose of the subsidiary was in harmony with the intent of Congress, *i. e.*, to provide a better wholesale marketing activity for producer goods, and was not "conducted on an ordinary profit-making basis," the creation of the subsidiary and subsequent distribution of patronage dividends to it, under an

agreement to return such dividends to Land O'Lakes which redistributed them to the members and other producers, was not violative of §§ 1382 and 1388. *See* S.Rep.No.52, 69th Cong., 1st Sess. 23–24 (1926).

The issues here presented and decided have not previously been decided by any court and little guidance is available in the reports accompanying the legislation as to the specific intent of the Congress as to these issues. The commentators have expressed themselves on whether a farmers' cooperative should be exempt from taxation. *Compare, e. g.,* Caplin, Taxing the Net Margins of Cooperative, 58 Geo.L.J. 6 (1969) *with* Zivan, Need for Reform in Taxation of Agricultural Cooperatives? 5 Ga.L.Rev. 529 (1971). Our Eighth Circuit Court of Appeals has recognized that the congressional purpose in bestowing tax exempt status on farmers' cooperatives was based upon the policy that a strong and prosperous agriculture is necessary for the national welfare. Cooperative Grain and Supply Co. v. Comm. of Internal Revenue, 407 F.2d 1158, 1162–63 (8th Cir. 1969).

We are satisfied that Land O'Lakes was proceeding in complete good faith in each of the contested areas of its operations. Its conduct was above board and satisfied the basic requirement of a cooperative, that it operate for the sole benefit of its members. There was no private profit or private profit motive. The nonexempt activity in which it participated was incidental to, and in furtherance of, its exempt activity, and in my view, proper under its exemption.

I conclude that the Director of Internal Revenue was in error when he terminated plaintiff's tax exemption for the year 1963.

Plaintiff is directed to submit Proposed Findings of Fact, Conclusions of Law, and Order for Judgment reflective of these expressions, and the parties are directed to prepare a computation of the tax refund due in accordance with their stipulation.