LAND O'LAKES, INC., formerly Land O'Lakes Creameries, Inc., a Minnesota Corporation, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 74–1100.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1974.

Decided April 30, 1975.

Leonard J. Henzke, Jr., Atty., Tax. Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Harold Jordan, St. Paul, Minn., for plaintiff-appellee.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

In this action, Land O'Lakes, a cooperative corporation, seeks a refund of income taxes in the sum of $254,978.74 (including interest) which it paid under a deficiency assessment for the year 1963. This deficiency arose because the Government revoked Land O'Lakes' status as an exempt farmers' cooperative under § 521 of the Internal Revenue Code, 26 U.S.C. § 521 (1970), for its operations during calendar year 1963. The district court ruled in taxpayer's favor and granted the refund. Land O'Lakes, Inc. v. United States, 362 F.Supp. 1253 (D.Minn.1973). The Government brings this appeal. We reverse.

The taxpayer operates essentially as a federated cooperative (a cooperative whose members are other cooperatives) but it does have individual members. Taxpayer primarily markets its mem-

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

bers' products (milk products, such as butter, milk powder, cheese, and fluid milk, as well as eggs, chickens, and turkeys) through wholesale and retail sales. It also performs a purchasing function for its members and patrons by buying and processing feed, fertilizer and seed and wholesaling them to member cooperative stores and other outlets for sale to farmers.[1] The taxpayer engaged in a multi-million dollar business, grossing about $200,000,000 in marketing operations and expending approximately $30,000,000 to purchase supplies for its members and other patrons in 1963.

Taxpayer engaged in retail marketing through operation of 20 outlets (some of which were small restaurants) known as Bridgeman's. The Bridgeman Division sold dairy products, such as milk and ice cream, obtained from members of the cooperative and from other producers, and it also sold sideline items, such as hamburgers, frozen foods, soup, and fried potatoes.

■■■ The rules applicable to exempt farmers' cooperatives appear in § 521(b) of the Internal Revenue Code, 26 U.S.C. § 521(b). They require that such an organization operate on a *cooperative basis* for the purpose of marketing the products of *members* or other *producers* and turning back to them the proceeds of sales, less the necessary marketing expenses, or operate on a cooperative basis

for the purpose of *purchasing supplies and equipment* for the use of members or other persons and turning over such supplies and equipment at actual cost plus necessary expenses.[2] The Code limits exempt farmers' cooperatives' transaction of business with nonmembers and nonproducers. *See* 26 U.S.C. § 521(b)(4). As relevant here, a supply cooperative does not qualify for an exemption when it purchases supplies for persons who are neither members nor producers to the extent of more than 15 percent of the value of all its purchases. *Id.*[3]

Only some of Land O'Lakes' total marketing and supply activities are under review in the instant case. First, the taxpayer, as part of its supply activities in 1963, made sales at wholesale to a number of agricultural supply stores. These stores were not member cooperatives of the taxpayer. The stores in turn sold the supplies or equipment at retail to their customers. The sales by taxpayer to these retail stores were made under an agreement which designated the retailer as an agent for the ultimate farmer-consumer and stipulated that the farmer-consumer would receive any patronage dividends attributable to the transactions.

Second, as part of its marketing activities, the taxpayer marketed at wholesale in 1963 certain products, such as special cheeses and brown eggs, which it obtain-

---

1. The regulations of the Internal Revenue Service provide that an association engaged both in marketing farm products and purchasing supplies and equipment may operate as an exempt cooperative only if it meets the requirements of the Code as to each of its functions. 26 C.F.R. § 1.521–1(c) (1963).

2. Subsection (b)(1) of § 521 reads as follows:

    (b) Applicable rules.

    (1) Exempt farmers' cooperatives.—The farmers' cooperatives exempt from taxation to the extent provided in subsection (a) [26 U.S.C. § 521(a)] are farmers', fruit growers', or like associations organized and operated on a cooperative basis (A) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (B) for the purpose of

purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses.

3. Subsection (b)(4) of § 521 reads as follows:

    (4) Transactions with nonmembers.—Exemption shall not be denied any such association which markets the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members, or which purchases supplies and equipment for nonmembers in an amount the value of which does not exceed the value of the supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 percent of the value of all its purchases.

ed from nonmembers because they were not available from its member cooperatives. Taxpayer's wholly-owned affiliate, Northwest Dairy Products Company, made contracts for these items with a number of proprietary companies and received patronage dividends, as allocated by taxpayer, for marketing them. Ultimately, these dividends were reallocated to taxpayer's members and producers who marketed their products through Land O'Lakes.

Third, as we have noted, taxpayer sold at retail nonproducer items such as hamburgers, frozen foods, and soft drinks through its Bridgeman ice cream stores. These sales amounted to $977,475 in 1963, which the Government calculates as 17 percent of Land O'Lakes' marketing sales at retail that year.

In 1970, the Government declared that taxpayer had forfeited, beginning in 1963, its entitlement to be taxed as an exempt farmers' cooperative under § 521 because of these marketing and supply activities.

The primary issue before us is whether taxpayer violated § 521(b) of the Internal Revenue Code and thus lost its exemption on any of several grounds urged by the Government.[4] We hold that taxpayer exceeded the scope of permissible transactions for a tax-exempt cooperative in both its marketing and supply activities and we uphold the Government's denial of the exemption. We deem it necessary to discuss only the first three of the five grounds for reversal advanced by the Government. *See* note 4 *supra*.

■ Preliminarily, we note that both exempt and nonexempt farmers' cooperatives receive special tax treatment under the Internal Revenue Code. Such organizations can deduct from gross income amounts allocated and distributed to patrons out of the net earnings of the cooperative. Subchapter T of the Internal Revenue Act of 1954, as amended, 26 U.S.C. §§ 1381–1388. *See generally* Logan, Federal Income Taxation of Farmers' and Other Cooperatives: Part II, 44 Tex.L.Rev. 1269 (1966). A farmers' cooperative qualifying as *exempt* obtains additional tax advantages, for it may also deduct from gross income (1) amounts paid during the taxable year as dividends on its capital stock and (2) amounts paid or properly allocated to its patrons from earnings derived from business done with the United States or its agencies, or from sources other than patronage (such as earnings on its investments). 26 U.S.C. § 1382(c). *See generally* Logan, Federal Income Taxation of Farmers' and Other Cooperatives, 44 Tex.L.Rev. 250, 279–85 (1965). In seeking retention of its exempt status, Land O'Lakes desires the benefit of all deductions from gross income authorized by law for an exempt cooperative. We turn to a consideration of whether its conduct in 1963 justified the Government's deter-

---

4. The Government divides its contentions that taxpayer could not claim exempt status into separate and alternative subdivisions as follows:

1) The taxpayer's purchases of supplies and equipment which it distributed and sold through nonmember retail outlets, referred to as agent-buyers, constituted purchases for the use of nonmembers-nonproducers. These purchases, when added to other purchases which were sold outright to nonmembers-nonproducers, exceeded the 15 percent limitation of § 521(b)(4).

2) In the alternative, if the transactions with agent-buyers did not violate § 521(b)(4), they nevertheless fall outside those authorized for an exempt cooperative because, inasmuch as the retailer made a profit on each transaction, the supplies did not reach the ultimate consumer at actual cost less necessary marketing expenses as required by § 521(b)(1).

3) If the agent-buyer transactions do not suffice to bar taxpayer from claiming an exempt status, Land O'Lakes nevertheless lost its exemption by paying patronage dividends to Northwest, a nonproducer.

4) Alternatively, on the marketing side, the taxpayer violated § 521(b)(1) by selling nonproducer merchandise (certain kinds of butter, jumbo and brown eggs, fresh poultry, turkeys, milk powder, cheese specialties) at wholesale.

5) Alternatively, on the marketing side, the volume of sideline sales of nonproducer products at retail (hamburgers, soft drinks, etc.) exceeded the five percent permissible deviation adopted by the Internal Revenue Service for the sale of nonproducer products by an exempt cooperative.

mination that it had lost its exempt status.

I. *Agent-Buyer.*

A. Prior to 1963, taxpayer distributed supplies and equipment to its members and other farmers through its member cooperatives, which at that time were exclusively creameries, and through company-owned stores. In the years immediately preceding 1963 the number of member cooperatives began to. dwindle as small creameries either went out of business or were acquired by larger concerns. Taxpayer found that it was unable to compensate for this reduction in its distribution capacity by establishing company stores and by sales to cooperative grain elevators. To restore this capacity it formulated the device of the agent-buyer.

Agent-buyers were "primarily small businesses with a single owner-operator." [Order of district court, Dec. 4, 1973, Civ. No. 3–71–49, at 15.] They ranged in size from those with modest inventories to those with "a sizeable business." [Trial Tr. 117–18.] In addition to acting as agent-buyers of taxpayers, these businesses ordinarily were established feed and agricultural supply dealers. Whatever their motive in agreeing to act as agent-buyers, the dealers contracted with taxpayer, at taxpayer's initiative, to sell taxpayer's supplies to farmers. The terms of the agreement between these dealers and appellee are important and bear summarization:

1) Taxpayer agreed to deliver Land O'Lakes feed, seed, and fertilizer, as ordered by agent-buyer, on regularly established credit terms.
2) The agent-buyer agreed to sell these items to farmers by means of sales slips furnished by Land O'Lakes, with copies of the slips to be returned to Land O'Lakes.
3) Land O'Lakes agreed to calculate patronage dividends on the basis of sales slips returned by the agent-buyer and the agent-buyer agreed that such dividends belonged to the retail farmer-customers of the agent-buyer.
4) Feeds used as an ingredient in the agent-buyer's own feed mixture were not covered by the agreement. As to these feeds, the agent-buyer was deemed the patron and, as such, entitled to patronage dividends. [App. 100–01.]

Notwithstanding the taxpayer's intent to create a cooperative-patron arrangement with the farmer-consumer, the record establishes that Land O'Lakes sold its supplies unconditionally to the retail outlets without knowing the identity of the persons who would receive the products as alleged "principals." The risk of loss or sale remained with the retailers on delivery. The agent-buyer remained free to set the retail price on his sale to a customer and would gain the profit or bear any loss incident to the sale. Except for their obligation to forward sales slips to the taxpayer, agent-buyers, who operated farm stores and sold primarily to farmers, marketed Land O'Lakes' products just as they did any other inventory item.

The district court did not find any agency relationship between the agent-buyer and the ultimate farmer-consumer at the time that Land O'Lakes delivered its feed or other products to the agent-buyer. The court held that because these supplies ultimately reached the farmer, who thereby became entitled to the patronage dividend, their purchase by Land O'Lakes for sale to agent-buyers should not be considered a purchase made by Land O'Lakes for persons who were "neither members nor producers" within the 15 percent limitation of § 521(b)(4). That limitation reads as follows:

(4) Transactions with nonmembers. Exemption shall not be denied any such association * * * which purchases supplies and equipment for *nonmembers* in an amount the value of which does not exceed the value of the supplies and equipment purchased for *members, provided the value of the purchases made for persons who are neither members nor producers does*

*not exceed 15 percent of the value of all its purchases.* [Emphasis added.] [5]

■ We disagree with this construction of the statute as applied to the undisputed facts disclosed here. Statutory language exempting farmers' cooperatives from the full burdens of taxation is to be strictly construed. Cooperative Grain & Supply Co. v. Commissioner, 407 F.2d 1158, 1162 (8th Cir. 1969); *see* Farmers Union Co-op. Co. v. Commissioner, 90 F.2d 488, 493 (8th Cir. 1937). Persuasive policy reasons support this construction. Congress provided tax-exempt status for agricultural cooperatives satisfying certain carefully defined criteria in order to enable the farmer-members of such cooperatives better to compete in the marketplace. Congress made the determination that agricultural cooperatives which could not comply with these criteria did not need the competitive advantages conferred by tax exemption. *See generally* Paul, Justifiability of the Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes, 29 Minn.L.Rev. 343 (1945).

■ Tax liability, or exemption therefrom, depends upon the substance and not the form or name of a transaction or event. *E. g.,* Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 266–67, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Dingman v. United States, 429 F.2d 70, 73 (8th Cir. 1970); Oesterreich v. Commissioner, 226 F.2d 798, 801–03 (9th Cir. 1955). Here, taxpayer elected to wholesale its supplies to nonmember proprietary stores which resold these items at retail. Land O'Lakes parted with title to these goods without knowing who, if anyone, the agent-buyer's "principal" would be and without attempting to assure the agent-buyer's sale of the goods to "principals" only. The agent-buyer device must be

disregarded as a legal fiction. *See* Commissioner v. P. G. Lake, Inc., *supra,* 356 U.S. at 266–67, 78 S.Ct. 691.[6]

The supplies which Land O'Lakes purchased for sale to independent retail farm stores must be deemed supplies purchased for persons who were neither members nor producers. Inasmuch as the parties agree that by including these items in the value of other supplies sold by Land O'Lakes to nonmembers and nonproducers the 15 percent limitation of § 521(b)(4) is exceeded, the Government properly denied Land O'Lakes exempt status for 1963.[7]

B. Additionally, Land O'Lakes' argument that it actually intended by use of the agent-buyer device to transact business with the farmer as its cooperative patron completely loses its force when the transaction is analyzed under basic principles applicable to an exempt supply cooperative. Under these principles, a cooperative must turn over supplies and equipment to members or other persons at "actual cost, plus necessary expenses." 26 U.S.C. § 521(b)(1)(B). Here, the ultimate consumer, the farmer, paid the retailer, the agent-buyer, a price which likely included a markup on cost to return a profit to the retailer. Such an arrangement offends the statutory requirement that an exempt farmers' supply cooperative operate on a nonprofit basis. Here, a middleman retailer entered into the chain of distribution to reap a profit from the transaction. Such a profit should be distinguished from a permissible "necessary expense" under § 521(b)(1)(B). Taxpayer, by its failure to comply with that section of the Code, lost its exempt status for the year 1963.

II. *Northwest Dairy Products Company.*

■ We also hold that taxpayer breached the rules for retaining its ex-

---

**5.** *See* note 3, *supra,* for the full text of this subsection.

**6.** This *illusory* agency must be distinguished from the true agency relationship at issue in Producers Gin Ass'n v. Commissioner, 33 T.C. 608 (1959), a case cited and mistakenly relied upon by the appellee.

**7.** We note that in later years the taxpayer found the restrictions of § 521 unduly burdensome to its business operations. In 1970 the taxpayer elected to begin operation as a nonexempt cooperative.

emption by treating its subsidiary, Northwest, as a patron and paying it patronage dividends on the margins earned from marketing certain products.

Northwest purchased the products in question from outside firms on a contract basis and Land O'Lakes thereafter marketed them. The taxpayer purchased at cost some $5,600,000 worth of these products from Northwest in 1963. The products consisted of items that Land O'Lakes' members or producers could not supply, such as brown eggs, certain kinds of butter, special kinds of poultry, turkeys, milk powder and cheese, and raw, bulk cheese for use in taxpayer's newly-acquired cheese processing plant in Spencer, Wisconsin.

Departing from what was presumably its practice prior to 1963, Land O'Lakes chose not to treat as patrons and return to them any patronage dividends the various proprietary companies from which Northwest purchased these products. Rather, the profits attributable to Land O'Lakes' distribution of the products were returned to Northwest as patronage dividends. Following receipt of a dividend, which in 1963 amounted to $63,734.76, Northwest refunded it to the taxpayer and taxpayer would then, in the next fiscal year, channel the dividend to its other producer-patrons. [Order of district court, Dec. 4, 1973, at 10–11.]

The terms of 26 U.S.C. § 521(b)(1)(A) expressly require that a cooperative market only the products of "members or other producers." Land O'Lakes' practice of marketing products obtained from Northwest violates this requirement, for Northwest is not a producer but rather a purchasing agent for Land O'Lakes and Northwest, even as a member, did not market its own produce, but that of others. Although the term producers is not specifically defined by law, a regulation of the Internal Revenue Service implied-

ly excludes Northwest from its coverage by referring to "farmers, fruit growers, dairymen, etc." as producers. 26 C.F.R. § 1.521–1(a)(1).[8]

In ruling that these transactions with Northwest did not justify revocation of taxpayer's exempt status, the district court made the following statement:

Although there is no statutory, judicial or administrative position specifically authorizing the wholesale marketing of nonproducer goods by a farmers' cooperative, the Court finds that the evidence offered by Land O'Lakes with regard to the purchases from its subsidiary establishes that the activity was in accord with the apparent congressional intent which underlies § 521(b)(1)(A). [362 F.Supp. at 1258.]

We do not believe such a practice by an exempt cooperative can be justified on the basis of any "underlying" congressional intent, for the statute very specifically limits exemption to an operation restricted in scope to that of "farmers', fruit growers', or like associations organized and operated on a cooperative basis * * * for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses * * *." 26 U.S.C. § 521(b)(1). Where statutory language is unambiguous, as this is, we have no occasion to consider Congress' intent except as it is expressed in the statute itself. E. g., Taft v. Commissioner, 304 U.S. 351, 358–59, 58 S.Ct. 891, 82 L.Ed. 1393 (1938); Birmingham v. Rucker's Imperial Breeding Farm, Inc., 152 F.2d 837, 840–41 (8th Cir. 1945).

The marketing of nonmembers' products through a member which is not a producer[9] exceeds the narrow range of activities authorized by § 521(b)(1) for an exempt cooperative organized and op-

8. In Cooperative Grain & Supply Co. v. Commissioner, 407 F.2d 1158 (8th Cir. 1969), this court referred to farmers, fruit growers, livestock growers, and dairymen as producers. Id. at 1159.

9. The Internal Revenue Service has permitted the marketing of nonmember-nonproducer items by an exempt cooperative without the duty to pay patronage dividends in certain emergency situations, such as when products supplied by members prove inadequate to fill outstanding orders. I.T. 1598, II–1 Cum.Bull. 159 (1923), modified by Rev.Rul. 70–319, 1970–1 Cum.Bull. 284.

erated to market the "products of members or other producers." Accordingly, Land O'Lakes lost its exemption for the year 1963 because it undertook to market nonmember-nonproducer products.

III. *Deductions.*

In the district court, the Government contended that even if Land O'Lakes had qualified as an exempt farmers' cooperative in 1963, its deduction for patronage dividends to Northwest should be denied nonetheless. The district court allowed the deduction, holding that Northwest was a patron for purposes of §§ 1382 and 1388.

■ As we have already noted, an exempt cooperative may deduct amounts allocated to its patrons from sources other than patronage. 26 U.S.C. § 1382(c)(2)(A). A nonexempt cooperative may not take this deduction. Because the district court did not consider Land O'Lakes' claim of this, as well as other, deductions in light of its status as a nonexempt cooperative, we remand the case to the district court for a determination of the deduction, if any, to which taxpayer is entitled as a nonexempt cooperative and a determination of Land O'Lakes' tax liability as a nonexempt cooperative.

Reversed and remanded for further proceedings.