**CO-OPERATIVE GRAIN & SUPPLY CO.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 19267.

United States Court of Appeals
Eighth Circuit.

Feb. 27, 1969.

Robert C. Guenzel, Lincoln, Neb., for petitioner.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C., for respondent, Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson, and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief.

L. James Harmanson, Jr., Washington, D. C., filed brief of amicus curiae, National Council of Farmer Cooperatives.

Before MATTHES, GIBSON and LAY, Circuit Judges.

MATTHES, Circuit Judge.

This case is before us on petition to review a decision of the Tax Court sustaining deficiencies and penalties assessed against Co-Operative Grain & Supply Co., (taxpayer) for income taxes for the years 1958, 1959, 1960 and 1961.

Taxpayer is a marketing and purchasing farmers' cooperative organization, having capital stock, dealing in grain and farm supplies. It is incorporated under Nebraska law and has its office and principal place of business at Roseland, Nebraska. During the years in question there were more than 300 producers owning stock issued by taxpayer. Taxpayer filed income tax returns on the accrual basis for 1958 through 1961. It applied to the district director for tax exemption under § 521 of the 1954 Internal Revenue Code, 26 U.S.C. § 521, on September 2, 1960. Following an examination of taxpayer's records the director advised it on November 3, 1961, that it did not qualify for exempt status.

The Commissioner determined deficiencies on the ground that the taxpayer did not qualify as an exempt farmers' cooperative because: (1) it did not operate on a cooperative basis in the manner required by § 521(b) of the 1954 Code; (2) it had failed to establish that substantially all of its capital stock was owned by producers who marketed their products or purchased their supplies and equipment through the association, as required by § 521(b) (2), and the applicable regulations. Other grounds relied upon by the Commissioner are not in issue here.

After a hearing, the Tax Court, Judge Fay, found that substantially all, if not all, of taxpayer's shareholders were producers (i.e., farmers, fruit growers, livestock growers, and dairymen), as required by § 521(b) (2) in order for a farmers' cooperative which has capital stock to qualify for exempt status. The Tax Court held, however, that substantially all of the shareholder-producers must market their products or purchase their supplies and equipment through the association. As to this phase of the case the court found:

"Petitioner, however, went no further than to argue that substantially all of its shareholders were producers. It made no attempt to argue that its shareholder-producers were active patrons of the association during the years in issue. Nor did petitioner offer any evidence with the purpose of proving this point. Consequently, although we find that substantially all, if not all, of petitioner's shareholders were producers during the years in issue, we cannot find that substantially all of petitioner's shareholders were active producers, that is—producers who marketed their products or purchased their supplies and equipment through the association."

Based upon its holding the Tax Court determined deficiencies for the years 1958 through 1961 of $69,352.78 and $7,608 in penalties for late filing of its returns for the years 1959 and 1960, pursuant to Section 6651(a) of the 1954 Code, 26 U.S.C. § 6651(a). The penalties for late filings are properly assessed only if taxpayer is not an exempt farmers' cooperative under § 521(b) (2).

The issues on appeal are whether: (1) the stockholders of taxpayer must be current patrons as well as producers for

taxpayer to be given exempt status under § 521(b) (2); (2) petitioner's motion for a further hearing should have been granted; (3) the penalties for untimely filing of the tax returns were properly assessed.

In pertinent part, § 521(b) (2) provides:

"Exemption shall not be denied any such association because it has capital stock, * * * *if substantially all such stock* * * *is owned by producers who market their products or purchase their supplies and equipment through the association.*" (Emphasis added.)

Taxpayer contends that the above quoted provision imposes no requirement that the stockholder-producers *currently* market any of their products or *currently* purchase any of their supplies through the cooperative. It argues that the legislative history of the section granting tax exempt status to farmers' cooperatives does not indicate or discuss the current patronage requirement. Rather, taxpayer submits the emphasis in the legislative history is on the requirement that substantially all of the stockholders be producers. As added support, taxpayer asserts that the Internal Revenue Service historically has not imposed a current patronage requirement. It bases this contention on the fact that neither the exemption application (Form 1028) nor the Exempt Cooperative Association Income Tax Return (Form 990-C) requests any information as to current patronage by shareholder-producers. Finally, taxpayer suggests that no regulations, no ruling, and no published Internal Revenue Service enforcement document or manual imposing such a requirement is known to exist.

On the other hand, the Commissioner takes the position that the language of § 521(b) (2) clearly "reflects a Congressional intent to restrict ownership and control of a cooperative to farmers who are directly (and therefore currently) involved in the association's activities." Moreover, the Commissioner points out that the exemption for farm cooperatives was initially quite narrow, and that treasury regulations have consistently required a close relationship between the cooperative and its shareholder-producers.[1]

Additionally, the Commissioner submits that the reason for granting tax exemption to true farm cooperatives rests upon Congressional intent to benefit the members of these associations. We are told that Congress "did not contemplate the situation where cooperatives competed against each other, and it did not intend to confer benefits to a certain cooperative if its members did not market their products through the cooperative but transacted their business elsewhere." In conjunction with this reasoning the Commissioner states that the taxpayer has shown no valid reason for restricting ownership of voting stock to producers if the latter are not required to transact business with the cooperative, and that if a producer owns stock in the cooperative but does not transact business through it, then he is no different from a nonproducing investor.

Although § 521(b) (2) has, as presently constructed, been in effect since 1926, the parties agree there is no case law dealing with the precise problem be-

1. Both the Revenue Act of 1916, ch. 463, § 11(a), 39 Stat. 756, 766 and the Revenue Act of 1921, ch. 136, § 231(11), 42 Stat. 227, 253, limited the exemption to cooperatives organized and operated for the purpose of dealing with its own members.

Treasury Regulations 33 (1918 ed.), Art. 75; Treasury Regulations 45 (1919 ed.), Art. 522; and Treasury Regulations 45 (1920 ed.), Art. 522 restricted exemption to cooperatives acting as sales agent for farmers, having no net income of their own, and whose business was limited to marketing products belonging to their members with the proceeds turned back to each member on the basis of the business done with each.

fore us.[2] This is so despite the fact that we are informed by amicus curiae National Council of Farmer Cooperatives [3] that the latest available figures reveal approximately 65 percent of the more than 8,000 farmers' marketing and purchasing associations in the United States are exempt farmers' cooperatives under § 521.[4]

In the absence of any direct authority we resort to established rules relating to the construction of statutes generally, and of federal taxing statutes in particular.

In the recent case of Community Blood Bank v. Federal Trade Commission, 405 F.2d 1011 (8th Cir., January, 1969), we recognized that a general rule of statutory construction requires the courts to ascertain the intent of legislation from the language used. "The legislative will must be ascertained from the statute if it is clear and plain and the whole act is internally cohesive," citing 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951), 405 F.2d at 1015. We also observed that "the plain, obvious and rational meaning of a statute is to be preferred to 'any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' Lynch v. Al-

worth-Stephens Co., 294 F. 190, 194 (8th Cir.1923), aff'd. 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660 (1925)." Id. at 1015. Finally, we stated "common words are to be taken in their ordinary significance in the absence of an indication of a contrary intent. Westerlund v. Black Bear Mining Co., 203 F. 599 (8th Cir.1913)." Id. at 1015.

The meaning of taxing statutes have been the subject of controversy, and courts have with consistency applied the foregoing and other rules of construction. Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) announces:

"As we have often said, 'the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses.' (Citing authorities.) Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose."

Judge Blackmun reviewed at some length the principles to be applied in interpreting revenue statutes in Cherry-Burrell Corp. v. United States, 367 F.2d 669, 674 (8th Cir.1966) and appropriately observed:

"These cases say, we think, that exemption depends upon legislative

---

Although there is virtually no legal authority suggesting that the statute requires a current patronage requirement, such a suggestion is neither novel nor unheard of. In Legal Phases of Farmer Cooperatives (FCS Bulletin 10), a publication by the Farmer Cooperative Service of the United States Department of Agriculture, originally written by L. S. Hulbert, as a member of the Department of Agriculture's general counsel's office, and most recently revised in 1958 by Raymond J. Mischler, likewise an attorney in the general counsel's office, there are summarized ten fundamental conditions for qualification as a tax exempt cooperative under § 521. Among those listed is the following:

"7. Substantially all voting rights must be held by actual producers who currently patronize the association." (Emphasis added.) Id. at 198.

This requirement is further explained:
"If an association is owned and controlled by farmers, but a substantial percentage of them are not patronizing the association, this situation might raise a question as to the right of such an association to exemption because it will be remembered that the voting stock of an association must be 'owned by producers who market their products or purchase their supplies and equipment through the association'." Id. at 206.

3. Amicus strenuously supports taxpayer's position.

4. Amicus states that a recent survey conducted by it shows approximately 72 percent of its members are exempt.

grace; that it is not present where there is doubt or ambiguity as to the meaning of the statute; that it does not come about by implication; and that legislative purpose is significant." *Id.* at 674.

■ The Supreme Court has also unequivocally held that provisions of a taxing statute granting special exemptions are to be strictly construed against the taxpayer. Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29 (1940). See also Luehrmann's Estate v. Commissioner of Internal Revenue, 287 F.2d 10 (8th Cir. 1961).

■ And finally, the courts have recognized that Congress has imposed strict requirements upon a cooperative which must be satisfied in order for the cooperative to qualify for exemption under § 521. Farmers Union Co-op. Co. of Guide Rock, Neb. v. Commissioner of Internal Revenue, 90 F.2d 488, 493 (8th Cir.1937); Producers' Creamery Co. v. United States, 55 F.2d 104, 106 (5th Cir.1932). See also Farmers Union Cooperative Oil Co. v. Commissioner, 38 B.T.A. 64 (1938).

Application of the foregoing rules of construction impels the conclusion that the Tax Court was on sound ground in concluding that the Act does require current patronage by taxpayer's shareholder-producers.

■ The pertinent part of the statute under consideration recites in plain and unequivocal language that substantially all of the voting stock must be owned by producers "who market their products or purchase their supplies and equipment through the association." There are no exceptions, and as we read the crucial phrase we are unable to discern any intent on the part of Congress to grant a cooperative exempt status if its stockholding producers market their products or purchase their supplies through the association only at such times as the producers may determine that it is expe-

dient for them to do so. If Congress had not intended to impose a patronage requirement upon the stockholder-producers there would have been no reason to include in the statute the language under scrutiny. Congress in the enactment of a statute is presumed to have used no superfluous words. Tabor v. Ulloa, 323 F.2d 823 (9th Cir.1963); Born v. Allen, 110 U.S.App.D.C. 217, 291 F.2d 345 (1960).

The legislative history of the section also supports the Tax Court's holding that shareholder-producers must be active patrons of the cooperative. Tax exemption to nonprofit agricultural and horticultural organizations was first granted in the Income Tax Law of 1913, ch. 16, § II-G(a), 38 Stat. 114, 172. In the Revenue Act of 1916, ch. 463, § 11(a), 39 Stat. 756, farmers' marketing cooperatives acting as a sales agent for its members were permitted tax exemption. The Revenue Act of 1921, ch. 136, § 231(11), 42 Stat. 227, 253, extended the exemption to farmers' purchasing organizations. The law was then amended by the Revenue Act of 1926, ch. 27, § 231(12), 44 Stat. 9, 40, to allow farm cooperatives with capital stock exempt status. The portions of the exemption provision with which we are now concerned have remained unchanged since its original enactment. The underlying reasons for the enactment of the 1926 provision are set forth in Senate Report No. 52, 69th Cong., 1st Sess. 23–24 (1939).[5] In part, the Senate Report states as follows:

> "A capital stock association is not to be denied exemption if substantially all the stock is owned by *producers marketing or purchasing through the association.*" (Emphasis added.) *Id.* at 24.

The use of the present tense in this report evinces a Congressional intent that shareholder-producers must currently and actively patronize the cooperative.

The history of the development of farm cooperatives shows that they were

---

5. See also House Conference Report No. 356, 69th Cong., 1st Sess. 36–37 (1939).

organized primarily for the purpose of helping individual farmers to better their bargaining position in the sale of their products and the purchase of their supplies.[6] In granting favorable tax treatment to certain farmer cooperatives Congress recognized their contribution to the agricultural community. Justification for bestowing upon them tax exempt status is based upon the policy that a strong and prosperous agriculture is necessary for the national welfare.[7]

It must be kept in mind that the policy behind the tax exemption is not to benefit the cooperative as a business organization, but to benefit its member-producers.

> "The fundamental characteristics of an agricultural cooperative is that it is operated for the mutual benefit of its members as producers—not as stockholders. *Advantages which accrue to a member of a cooperative accrue primarily because of his patronage with the association and not because of any financial investment he may have made therein.*" (Emphasis added.) [8]

It logically follows that the primary purpose of the cooperatives—to give farmers a better bargaining position in the marketplace—cannot be accomplished unless the farmers patronize the association.

As indicated above, the specific issue of a current patronage requirement has never been directly presented in any prior cases. However, in Farmers Union Co-operative Oil Co. v. Commissioner, *supra*, the question for determination was whether petitioner was a tax exempt cooperative under the section of the revenue act with which we are now concerned. It was held for a number of reasons that petitioner did not qualify for tax exempt status. One of these was stated as follows:

> "All of the stock of petitioner was owned by producers, but the evidence fails to show that all of its shareholders purchased their supplies and equipment through the petitioner." *Id.* 38 B.T.A. at 72.

We have considered the numerous arguments in support of the contention that we should reject the current patronage concept. They include, among others, (1) the asserted prior practices of the Commissioner in not adhering to

---

6. See Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n, 276 U.S. 71, 92–96, 48 S.Ct. 291, 72 L.Ed. 473 (1928).

   Paul, "The Justifiability of the Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes," 29 Minn. L.Rev. 343 (1945), notes that the problems of marketing products in distant markets increased the farmers' need for a cooperative method of selling their crops.

   > "The farmer, forced to move his crop, had little bargaining power with the more centrally organized shipper, packer or other distributor, and was forced to accept almost any arrangements the marketing agency made with or for him. The farmer had little choice. If he were to sell his crop at all, he was frequently faced with the necessity of accepting what the shipper or packer offered." *Id.* at 347–48.

   As to the purchasing aspect he notes:

   > "Prior to the institution of group buying farmers, particularly small farmers, purchased their supplies and equipment at *retail* prices, but sold their product at *wholesale* prices. Very few farmers had enough bargaining power, or the quantity needs, to [demand] * * * wholesale prices." *Id.* at 350.

7. See Paul, *supra*, 29 Minn.L.Rev. 343, 352–53; 13 Law & Contemp.Prob. 535, 538 (1948), quoting the First Interim Report of the House Committee on Small Business, April 9, 1946:

   > "The enactment and reenactment of Section 101(12) and (13) of the Internal Revenue Act appear to represent a continued attitude on the part of the Congress that the maintenance of a sound agricultural economy is necessary for the preservation of the national well-being."

8. Paul, *supra*, 29 Minn.L.Rev. 343, 344, quoting A Statistical Handbook of Farmers' Cooperatives, Farm Credit Administration, Bulletin No. 26, 1–2.

this requirement;[9] (2) practical considerations which render compliance impossible with any actual or specific current patronage requirement, *e.g.*, (a) a voting stockholder may encounter a crop failure and have nothing to market, (b) sickness, disability, or death of a patron farmer-stockholder, (c) a member of a cooperative dealing in high priced farm machinery may have no need for the particular machinery each year.

All of the practical aspects discussed by amicus have appealing logic, and constrain us to believe that the Commissioner would and perhaps does accord them due consideration in determining whether there is substantial compliance with the patronage requirement. Certainly the Commissioner should not engage in arbitrary action in determining whether a cooperative qualifies for exemption.

Much is said about the failure of the Internal Revenue Service to promulgate any annual or other specific patronage requirement by way of regulations or ruling. In this connection it is asserted, without contradiction, that the national office of the Internal Revenue Service has had under consideration for over two years the development of appropriate guidelines interpreting the meaning of the pertinent part of § 521(b) (2). Assuming the verity of this assertion, from which we imply that there is a substantial number of cooperatives who entertain doubt as to some of the requirements for exemption, it would seem that clarifying data would serve a useful purpose for all concerned. Certainly the

Internal Revenue Service, because of its expertise in this area, is competent to promulgate regulations dealing with all aspects of the problem which are not fully and clearly spelled out in the Act.

■ Be that as it may, it is our responsibility to interpret the statute under scrutiny by application of controlling rules of construction and in light of the Congressional purpose in granting exemption. This course leads us to the conclusion that substantially all of the shareholder-producers are required to market their products and purchase their supplies through the taxpayer on a current basis. That is our holding.[10]

■ Taxpayer also contends that the Tax Court erred in refusing to grant its motion for a further hearing, made after the decision of the Tax Court was filed. Taxpayer asserts that it is in a position to establish in another hearing that it satisfies the current patronage test; that this was not an issue and was raised for the first time by the court in its decision. Although the record is not too illuminating it is apparent that the evidence that the taxpayer introduced was inadequate to establish that it does satisfy this requirement. We are nonetheless of the view, based upon the colloquy between Judge Fay and counsel relating to the issues, that the taxpayer should not be faulted for not presenting all of its records and other evidence bearing upon this question. Although the Commissioner in his brief opposes a remand, counsel for the Commissioner in oral argument voiced no serious objection to such action and indicated that

---

9. We find nothing in the record or elsewhere to afford proof of the course heretofore pursued by the Commissioner or of his interpretation of § 521(b) (2).

10. Neither taxpayer nor amicus has discussed the question of the *amount* or *quantity* of products which currently must be sold or supplies purchased through the cooperative. The Tax Court did not specifically discuss or resolve this issue. As we read the record this matter was not in controversy, at least not directly. The Commissioner in brief, however, as-

sumes that *substantially all* of the shareholder-producers must market *substantially all* of their products and purchase *substantially all* of their supplies through the cooperative. The posture of the record is such that we refrain from deciding this question. We do suggest, however, that imposition of the standard proposed here by the Commissioner could produce impractical and perhaps oppressive results. We believe the Tax Court, on remand, should resolve this question, if it becomes an issue, by application of a reasonable and realistic standard.

the Commissioner's chief concern was to obtain a definitive ruling on the current patronage issue.

We conclude that in the interest of justice, the case should be remanded to the Tax Court to afford the taxpayer a full opportunity to produce additional evidence on the question of current patronage.

■ Finally, we consider the § 6651(a) delinquency penalty imposed for untimely filing of the tax returns for 1959 and 1960. Section 6072(b) of the 1954 Code requires a nonexempt cooperative whose returns are made on the basis of the calendar year to file its return by March 15 following the close of the calendar year. An exempt cooperative is not required to file until September 15 following the close of the calendar year.

Taxpayer contends that it had reasonable cause to believe that it was an exempt cooperative permitting it to file as late as September 15 following the close of the calendar years in question. It argues that reliance on the advice of its counsel and accountant is reasonable cause for failing to file the returns at the earlier dates. See Mayflower Investment Co. v. Commissioner of Internal Revenue, 239 F.2d 624 (5th Cir. 1956); Commissioner of Internal Revenue v. American Ass'n of Engineers Employment, 204 F.2d 19 (7th Cir. 1953); Haywood Lumber & Mining Co. v. Commissioner of Internal Revenue, 178 F.2d 769 (2d Cir.1950).

However, as the Commissioner points out and as the record shows, the taxpayer did not offer any evidence in the Tax Court to show that it had relied in good faith on the advice of its counsel and accountant in filing the 1959 and 1960 returns to meet the September 15 deadline set for exempt cooperatives. The record also shows that the taxpayer's liability for the delinquency penalties was at all times at issue in the case. Taxpayer had ample opportunity to offer proof to substantiate its contention, but did not do so.

Thus, the Tax Court was correct in holding that there was no reasonable cause within the meaning of § 6651(a) sufficient to defeat the imposition of the penalties for late filing, and, secondly, in refusing to reopen this issue.

Since both the taxpayer and the Commissioner agree that the penalty is properly imposed only if the taxpayer was in fact a nonexempt cooperative for the 1959 and 1960 tax years, the final determination as to the imposition of the § 6651(a) penalties must be determined by the Tax Court in light of its decision on remand.

Remanded for further proceedings consistent with this opinion.