FARMERS COOPERATIVE COMPANY (SUCCESSOR-IN-NAME TO FARMERS CO-OP OIL COMPANY), PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FARMERS COOPERATIVE SOCIETY, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15643–82, 5988–83. Filed October 24, 1985.

*Richard S. Wheeler* and *Stanley W. Rosenkranz*, for the petitioners.

*Ruud L. DuVall*, for the respondent.

GERBER, *Judge*:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 15643–82 | Farmers Cooperative Co. | [1]1977 | $2,934.94 |
| | | 1978 | 891.47 |
| 5988–83 | Farmers Cooperative Society | [2]1979 | 12,638.23 |
| | | 1980 | 10,695.18 |

The issue for our consideration is whether petitioners are exempt cooperative associations under section 521[3] because

---

*By order of the Chief Judge, this case was reassigned from Judge Theodore Tannenwald, Jr., to Judge Joel Gerber for disposition.

[1]Respondent initially characterized the grain storage income received by Farmers Cooperative Co. (company) in 1977 and 1978 as non-patronage-sourced income. Pursuant to revocation of the company's exemption, respondent disallowed the amount of the company's patronage dividend deduction which represented a distribution of the "non-patronage-sourced" income to its patrons. Respondent has conceded, however, that all of the company's grain storage income was patronage-sourced income and therefore deductible.

[2]Respondent has conceded that he erroneously disallowed $3,070.01 of the total patronage dividend deduction claimed by Farmers Cooperative Society (society) for its 1979 tax year. Respondent originally determined that the society's patronage dividends were made in the form of nonqualified, rather than qualified, written notices of allocation. While one of the definitional requirements for a qualified written notice of allocation is that the recipient patron must have consented to take the face amount of such notice into account in computing his own income (sec. 1388(c)(1), I.R.C. 1954 as amended), respondent overlooked the fact that the society, prior to transacting any business with the recipient patrons, obtained such consent in one of the three permissible types of consent under sec. 1388(c)(2)(A), I.R.C. 1954 as amended. Accordingly, the deficiency amount for 1979 and 1980 will require recomputation. If we find for respondent on any issue, a decision will be entered under Rule 155, Tax Court Rules of Practice and Procedure.

[3]All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years at issue, unless otherwise indicated.

"Exempt" in this context is somewhat different from its use in sec. 501 because farmers' cooperatives which meet the requirements set out in sec. 521 are subject to the normal tax, surtax, and alternative tax imposed upon corporations in general by sec. 11, except that in computing taxable income they are given the advantage of deductions which are not shared by cooperatives that do not meet the requirements (sec. 1381). While all cooperatives, whether exempt or nonexempt, are entitled to deduct amounts paid or allocated to their patrons (i.e., patronage dividends) (secs. 1382 and 1388), exempt cooperatives may also deduct (1) amounts paid as

"substantially all of the capital stock" of each petitioner "is owned by producers who market their products or purchase their supplies and equipment through" the respective petitioners as described in section 521(b)(2).

## FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly. The stipulation of facts, second stipulation of facts, and attached exhibits are incorporated herein by this reference.

### Farmers Cooperative Co.

Petitioner Farmers Cooperative Co. (company) is a cooperative incorporated under the laws of the State of Nebraska with its principal office in Platte Center, Nebraska. The company's fiscal year ends on September 30 each year. Utilizing the accrual method of accounting, the company filed Federal income tax returns for fiscal years ended September 30, 1977 and 1978, on Forms 990-C (Exempt Cooperative Association Income Tax Returns) with the Internal Revenue Service Center, Exempt Organizations Section, Cornwells Heights, Pennsylvania.

The company is a farmers' association organized and operated on a cooperative basis. Its purpose is to market the products of its members or other producers and remit to them the proceeds of sales less necessary marketing expenses on the basis of either the quantity or the value of the products furnished by them. The principal products are corn, milo, wheat, soybeans, and oats. The cooperative also purchases supplies and equipment for resale to its members or other persons. Such supplies and equipment are sold at actual cost plus operating expenses. The supplies and equipment principally involve fertilizer, agricultural chemicals, fuel, oil, tires, and equipment such as sprayers, tillage equipment, and grain wagons.

The company is a capital stock company. During 1977 and 1978, the company's authorized capital stock consisted of

dividends on capital stock and (2) amounts paid out of earnings from nonpatronage sources (sec. 1382(c)(1) and (2)). Thus, if a cooperative is exempt, such amounts are deductible regardless of whether they are paid out of patronage-sourced or non-patronage-sourced income. Secs. 1382(c)(2)(A) and 1388(a)(3). If a cooperative is not exempt, however, such amounts are deductible only if paid out of patronage-sourced income. Sec. 1388(a)(3).

40,000 shares of $12.50 par value common stock. Each share-holder was entitled to only one vote regardless of the number of shares owned.

In addition to its capital stock, the company carried evidences of ownership interest known as certificates of participation and equity credits on its books. Such forms of ownership did not entitle the holder to vote or otherwise participate in the management of the company's affairs.

During and after the 2 tax years in issue, the company's board of directors limited the ownership of its common stock to eligible persons[4] and regularly took action to purge nonpatronizing stockholders from its list of active, voting members. For example, the company's bylaws provided a procedure for recalling stock from persons who had ceased to be eligible shareholders because (1) they moved from the company's trade territory, (2) they failed to patronize the company for a one-year period, (3) they had died, or (4) they voluntarily withdrew from membership. The company does not require its patrons or shareholders to enter into membership agreements which require them to transact any particular annual quantity of their marketing or purchasing business with the company.

As of September 30, 1977, 670 producers held at least 1 share of the company's voting stock, 568 of whom (or 84.78 percent of the total) transacted business with the company during that year, by either marketing agricultural products through the company, purchasing agricultural supplies and equipment from the company, or a combination of the two. In addition, 32 producers began patronizing the company during its 1977 fiscal year and, during the course of that year, met all the qualifications to become shareholders of the company. The company's board of directors caused 31 of these 32 new members to receive 1 share of the company's stock issued on January 31, 1978, the day of the company's annual stockholders' meeting for its 1977 fiscal year.

Of the company's 102 voting shareholders who did not transact any business with the company during its 1977 fiscal year, only one shareholder had his stock either converted to

---

[4]The company's articles of incorporation and bylaws provided in pertinent part:

"Only producers of agricultural products, including lessors and landlords in share tenancies and farmers within the trade territory of this cooperative corporation, *who do business with the corporation annually*, may own the common stock of this cooperative. [Emphasis added.]"

nonvoting status or redeemed within 12 months after the end of the company's 1977 fiscal year. Cumulatively, the company either converted or redeemed two shareholders' stock within 18 months, 67 shareholders' stock within 24 months, and 75 shareholders' stock within 36 months, after the end of the company's 1977 fiscal year.

During the tax years in issue, the company owned and operated a facility for the receipt, handling, drying, and storage of grain produced by its patrons. This facility was licensed by the State of Nebraska as a grain storage warehouse having a capacity of 963,000 bushels. The total amount of grain handled by the company in any given year depended upon a number of variables. Accordingly, its storage facility did not always have sufficient capacity to handle all the grain produced by all its patrons in any given year.

The company's patrons delivered their grain to the company's elevator facility, at which time the grain was weighed, dried (if necessary), and placed in storage. Unless the patron had made a prior contractual arrangement with the company to deliver his grain for immediate sale, the patron had a period of time after the date of delivery to decide whether to sell the grain to the company or leave the grain in "open storage." A patron was not credited with patronage on the date he delivered the grain to the company but, rather, on the date the grain was sold. If on delivery, the patron placed the grain in open storage, the company accrued storage fees on its books, which it collected from the patron at the time the grain was sold. Only shareholders or those in the process of becoming shareholders were permitted to deliver grain to the company for storage. During its 1977 fiscal year, the company received grain storage fees in the amount of $66,643.80, which it classified as patronage-sourced income on its 1977 tax return. These grain storage fees were paid to the company by its member-patrons (i.e., not by nonmembers) and only such member-patrons (not the company) held title to the grain stored.

As of September 30, 1978, 698 producers held at least 1 share of the company's voting stock. Of this number, 576 (or 82.52 percent of the total) transacted business with the company during that year by either marketing agricultural products through the company or purchasing agricultural

supplies and equipment from the company, or a combination of the two. In addition, 33 producers began patronizing the company during its 1978 fiscal year and, during the course of that year, met all the qualifications to become shareholders of the company. The company's board of directors caused 1 share of the company's stock to be issued to 31 of the 33 new members as follows: (1) 1 on March 14, 1979; (2) 29 on March 15, 1979; and (3) 1 on September 18, 1981.

Of the company's 122 voting shareholders who did not transact any business with the company during its 1978 fiscal year, 4 had their stock either converted to nonvoting status or redeemed within 6 months after the end of the company's 1978 fiscal year. Cumulatively, the company either converted or redeemed 93 shareholders' stock within 12 months, 95 shareholders's stock within 18 months, 102 shareholders' stock within 24 months, and 117 shareholders' stock within 36 months after the end of the company's 1978 fiscal year.

During its 1978 fiscal year, the company received grain storage fees in the amount of $70,751.50 which it classified as patronage-sourced income on its 1978 tax return. Of these grain storage fees, $68,998.61 was paid to the company by its member-patrons (not by nonmembers) who held title to the grain stored, with the remaining $1,752.89 paid by Commodity Credit Corp.

The Internal Revenue Service recognized the company as an exempt cooperative association under section 521 beginning April 24, 1956. On March 31, 1982, however, the District Director of the Internal Revenue Service at St. Louis, Missouri, notified the company of respondent's determination to revoke the company's section 521 exemption for all tax years beginning on or after October 1, 1976. Respondent determined that the company had "not sufficiently limited the ownership of its common stock to active producers to meet the requirements of section 521(b)(2)." Respondent revoked the company's exemption after the company requested respondent (1) to apply the 85-percent test thus allowing the company a 2-year period of "lead time" after the close of its taxable year, to recall and cancel stock held by ineligible shareholders, and (2) to recognize and give effect to the company's cancellation of the voting privileges of ineligible shareholders prior to cancelling their stock.

*Farmers Cooperative Society*

Petitioner Farmers Cooperative Society (society) is a cooperative incorporated under the laws of the State of Iowa with its principal office in Sioux Center, Iowa. The society's fiscal year ends November 30 each year. Utilizing the accrual method of accounting, the society filed Federal income tax returns for the 2 tax years at issue on Forms 990-C (Exempt Cooperative Association Income Tax Returns) with the Internal Revenue Service Center at Kansas City, Missouri.

The society is a farmers' association organized and operated on a cooperative basis. Its purpose is to market the products of its members or other producers and remit to them the proceeds of the sales less necessary marketing expenses on the basis of either the quantity or the valve of the products furnished by them. The products are principally grain and hogs. The society also purchases supplies and equipment for the use of its members or other persons, and turns such supplies and equipment over to them at actual cost plus necessary expenses. The supplies and equipment are principally feed, seed, fertilizer, agricultural chemicals, and lumber products.

The society's authorized stock during 1979 and 1980 consisted of 40,000 shares of $10 par value common stock. The society limited ownership of its capital stock to eligible persons.[5] Each shareholder was entitled to one vote regardless of the number of shares owned. The society issued two classes of common stock: voting and nonvoting. Only agricultural producers could own shares of the society's voting stock. Nonagricultural patrons of the society (such as townspeople, college professors and administrators, housewives, etc. who patronized the society's farm and home center or its lumberyards) were issued nonvoting stock.

A nonmember could become a member and shareholder in one of two ways. First, the nonmember could purchase a share of the society's stock by paying the $10 membership fee. The society determines whether such person is an agricultural

---

[5]The society's articles of incorporation provided:

"The ownership of the capital stock of the corporation shall be limited to individual farmers, persons deriving income from their farms, or corporations engaged primarily in farming operations, substantially all of whose stockholders, officers and directors are farmers or share in the productivity of the farm."

producer, in which case a share of voting common stock is issued, or a nonproducer, in which case a share of nonvoting common stock is issued. Shares of stock can be purchased at any time during the course of the society's fiscal year. Second, a nonmember can choose not to purchase a share of stock, but rather earn it by patronizing the society. In that case, the society cannot issue the share of stock until after the end of its fiscal year, at which time it determines whether such person had sufficient patronage to earn a share of stock. The society's bylaws provide that if a nonmember fails to do sufficient business to earn a share of stock, he may contribute the balance in cash and receive a share of stock.

The society's board of directors regularly took action to control the transfer of its stock by shareholders thus insuring that only producers held its voting stock. For example, the society would redeem a member's share of stock or convert a voting shareholder's stock to nonvoting status if a voting shareholder moved out of the society's trade territory, or failed to patronize the society for a period of 2 consecutive years. The shareholders were given the option of having their shares redeemed in cash or converted to nonvoting shares. If a shareholder did not respond within a reasonable period of time, his voting stock was converted to nonvoting status.

The society's articles of incorporation and bylaws prohibited shareholders from transferring their shares without the society's board of directors' consent.[6] When a share was transferred to a nonproducer it was converted to nonvoting status. The bylaws also provided a means for shareholders to voluntarily withdraw from membership. In addition, the society, based on the required credit application of each membership applicant, determined whether that person was a producer or a nonproducer. Voting stock was issued to producers only.

From its books and records, the society could distinguish between business transacted with or for member-patrons, and business transacted with or for nonmembers. The society

---

[6]The society's articles of incorporation also contained the following provision for recalling stock from persons who ceased to be eligible or desirable as shareholders of the society:

"Any stockholder who ceases to be a cooperator, or becomes an undesirable stockholder in the opinion of the Board of Directors, may be expelled as a stockholder member, upon a two-thirds vote of the Board of Directors, whereupon said stockholder shall surrender his certificate and shall receive [in] full payment therefor the par value of such certificate."

maintained a record of all transactions (even though insignificant) and patronage dividends were paid on all accounts, no matter how small. The society was unable to determine from its records whether a patron was transacting more or less than 50 percent (or any other percentage) of his total marketing or purchasing business with the society during the year.

As of November 30, 1979, 5,158 persons held at least 1 share of the society's capital stock which includes both voting and nonvoting shareholders. Of these shareholders, 3,580 held voting shares, 2,849 of whom (or 79.58 percent of the total) transacted business with the society during that year, either by marketing agricultural products of the society or purchasing agricultural supplies and equipment from the society, or a combination of the two. As of the same date, 1,578 held nonvoting shares with 885 (or 56.08 percent of the total) transacting business with the society during that year by purchasing supplies and equipment from the society.

Of the society's voting shareholders who did not transact any business with the society during its 1979 fiscal year, 104 shareholders had their stock redeemed within 12 months after the end of the society's 1979 fiscal year. The society redeemed, in the cumulative, 190 shareholders' stock within 18 months, 221 shareholders' stock within 24 months, 283 shareholders' stock within 30 months, and 329 within 36 months after the end of the society's 1979 fiscal year.

As of November 30, 1980, 5,552 persons held at least 1 share of the society's capital stock which includes both voting and nonvoting shareholders. Approximately 3,734 shareholders held voting shares, 2,864 of whom (or 76.70 percent of the total) transacted business with the society during that year. Of the 1,818 nonvoting shareholders, 1,012 (or 55.67 percent of the total) transacted business with the society during that year by purchasing supplies and equipment from the society.

Of the society's voting shareholders who did not transact any business with the society during its 1980 fiscal year, 117 shareholders had their stock redeemed within 12 months after the end of the society's 1980 fiscal year. The society redeemed, in the cumulative, 179 shareholders' stock within 18 months, 225 shareholders' stock within 24 months, 263 shareholders' stock within 30 months, and 292 shareholders' stock within 36 months after the end of the society's 1980 fiscal year.

Beginning September 17, 1929, the society was recognized as an exempt cooperative association under section 521 and predecessor statutes. However, on March 8, 1979, the District Director of the Internal Revenue Service Center at St. Louis, Missouri, notified the society of respondent's determination to revoke the society's section 521 exemption effective for all tax years beginning on or after December 1, 1972. Using a "random sampling to determine the amount of stock held by producers," respondent, in revoking the society's exemption, determined that the society "did not comply with the stock ownership requirements" of section 521(b)(2).

## OPINION

The general question for consideration is whether petitioners are exempt cooperatives under section 521. Section 521 provides that certain farmer cooperative organizations are exempt from taxation.[7] With respect to cooperatives that issue stock, in order for the cooperative to be exempt[8] "substantially all" of the capital stock must be owned by producers[9] who market their products or purchase their supplies and equipment through the cooperative. Sec. 521(b)(2). In addition, the farmers' cooperative must demonstrate that the ownership of

---

[7]Sec. 521(b) provides:

(1) EXEMPT FARMERS' COOPERATIVES.—The farmers' cooperatives exempt from taxation to the extent provided in subsection (a) are farmers', fruit growers', or like associations organized and operated on a cooperative basis (A) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (B) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses.

(2) ORGANIZATIONS HAVING CAPITAL STOCK.—Exemption shall not be denied any such association because it has capital stock, if * * * and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association.

[8]The "substantially all" test does not apply to nonvoting preferred stock if the owners of the stock are not entitled or permitted to participate, either directly or indirectly, in the profits of the cooperative beyond the fixed dividends. Sec. 1.521–1(a)(2), Income Tax Regs.

[9]A "producer" is a person who bears the risks of agricultural production and who cultivates, operates, or manages a farm, i.e., one who is engaged in the business of farming. Rev. Rul. 67–422, 1967–2 C.B. 217, as amplified, Rev. Rul. 72–589, 1972–2 C.B. 282. Examples of "producers" are farmers, landlords in share tenancy, or tenant farmers. See sec. 175(a) and sec. 1.175–3, Income Tax Regs. On the other hand, a "nonproducer" is one who is not engaged in the business of farming but who may have acquired agricultural commodities by other means, such as sale or exchange.

its capital stock has been restricted "as far as possible." Sec. 1.521–1(a)(2), Income Tax Regs.

The term "substantially all" as used in section 521 is not defined in that statute or the underlying regulations. We have held, however, that 91 percent satisfies the "substantially all" requirement (*Farmers Co-Operative Creamery v. Commissioner*, 21 B.T.A. 265, 269 (1930)), while neither 78 percent nor 72 percent satisfies the requirement. *Co-Operative Grain & Supply Co. v. Commissioner*, T.C. Memo. 1973–164, on remand 407 F.2d 1158 (8th Cir. 1969), revg. in part and remanding T.C. Memo. 1967–132; *Petaluma Co-Operative Creamery v. Commissioner*, 52 T.C. 457, 465 (1969). The Commissioner has published the position that the "substantially all" test is considered to have been satisfied if at least 85 percent of such capital stock is held by producers. Rev. Rul. 73–248, 1973–1 C.B. 295.[10]

In addition, this Court (*Co-Operative Grain & Supply Co. v. Commissioner*, T.C. Memo. 1973–164) and the eighth circuit (*Co-Operative Grain & Supply Co. v. Commissioner*, 407 F.2d at 1162) have interpreted section 521(b)(2) to require that "substantially all" of a stock cooperative's shareholders not only be producers, but also be current and active patrons. While neither Court quantified this current patronage concept by defining what amount or quantity of business a producer-shareholder must transact with the cooperative in order to qualify as a current and active patron, the Commissioner has issued Rev. Proc. 73–39, 1973–2 C.B. 502, that attempts to define the quantum of business required.

The revenue procedure provides that a patron is a current and active patron *only if* he markets through that cooperative each year "more than 50 percent" of the products he produces and markets, *or only if* he purchases through that cooperative each year "more than 50 percent" of the supplies and equipment he purchases of the type handled by that cooperative. 1973–2 C.B. at 502–503. However, a person could be considered a current and active patron if, under all the facts

---

[10]The Commissioner apparently issued Rev. Rul. 73–248, 1973–1 C.B. 295, in light of the Eighth Circuit Court's mandate to issue guidance in this area. *Co-Operative Grain & Supply Co. v. Commissioner*, 407 F.2d 1158, 1164 (8th Cir. 1969). It should also be noted that the Commissioner published the 85-percent test in a ruling at least 4 years prior to the first reporting year involved in these consolidated cases.

and circumstances of his particular case, it was determined that he was unable to comply. 1973–2 C.B. at 503.

This is the first case where we have been asked to draw a bright line as to what percentage of stock ownership will satisfy the "substantially all" test of section 521(b)(2). Respondent, relying on the two administrative interpretations of the "substantially all" requirement, argues that petitioners are not exempt under section 521(b)(2) because "substantially all" of the capital stock is not "owned by producers who market their products or purchase their supplies and equipment through" the respective petitioner. Petitioners, on the other hand, argue that no court has decided exactly what percentage of stock ownership by such producers is sufficient in all cases to constitute compliance. In order to determine whether petitioners are exempt cooperatives under section 521(b)(2), we must address each respective test in turn.

## A. 85-Percent-of-Stock-Held-by-Producers Test

Petitioners have asked this Court to determine exactly what percentage of stock ownership will be sufficient. Petitioners argue that respondent's attempt to quantify the "substantially all" test plainly ignores this Court's prior holdings and, more fundamentally, contradicts the respondent's own regulations that impose the only additional mandate that the farmers cooperative must restrict ownership of the stock "as far as possible" to actual producers. Sec. 1.521–1(a)(2), Income Tax Regs. Thus, we are asked to determine whether the "substantially all" test has been satisfied based upon a factual weighing and balancing of all the factors to determine whether the cooperative has restricted the ownership of the stock as far as possible and not on a mechanical or quantitative test.

Petitioners contend that a quantitative test ignores this Court's opinions in both *Co-Operative Grain & Supply Co. v. Commissioner, supra,* and *Petaluma Co-Operative Creamery v. Commissioner, supra* at 465, where we stated that it was not necessary to determine what percentage would constitute compliance. Therefore, according to petitioners, this Court has not, nor should it now, hold that a mechanical, quantitative test is the appropriate standard to determine whether the "substantially all" requirement is satisfied. Rather, petitioners argue, determining what constitutes "substantially all" is

essentially a question of fact, depending on the particular circumstances of each case. Accord *Farmers Co-Operative Creamery v. Commissioner, supra*; *Farmers' Co-Operative Milk Co. v. Commissioner*, 9 B.T.A. 696 (1927).

Respondent, on the other hand, argues that the 85-percent test embodied in Rev. Rul. 73–248, *supra,* is a reasonable interpretation of section 521(b)(2). Respondent relies in his brief upon an unreported District Court opinion in *West Central Cooperative v. United States*, No. 1C 81–3029 (N.D. Iowa 1983). In that case, the taxpayers appealed after the District Court found that the 85-percent test is reasonable and in keeping with the congressional mandate embodied in the language of section 521(b)(2) (citing *United States v. Correll,* 389 U.S. 299, 307 (1967)). Based on the 85-percent test, the District Court concluded that the cooperative did not qualify for exemption because only 83.75 percent of the cooperative's shareholders were producers who marketed some of their products or purchased some of their supplies and equipment through the cooperative. Since the briefs in this case were filed, the Eighth Circuit Court of Appeals affirmed the District Court's opinion and conclusion that the 85-percent test in Rev. Rul. 73–248, *supra,* is a reasonable interpretation. *West Central Cooperative v. United States*, 758 F.2d 1269 (8th Cir. 1985), affg. per curiam an unreported District Court opinion. Because an appeal in these consolidated cases lies in the eighth circuit, we are bound by the eighth circuit's affirmation that the 85-percent test is reasonable. *Golsen v. Commissioner*, 54 T.C. 742, 756–758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

Nevertheless, we agree in concept with the Internal Revenue Service's 85-percent test and find it an appropriate measure in light of various court opinions interpreting the "substantially all" language of section 521(b)(2). Prior to the eighth circuit's affirmance of the holding that 83.75 percent does not satisfy the "substantially all" requirement, the highest percentage found to be less than "substantially all" was 78 percent (*Co-Operative Grain & Supply Co. v. Commissioner, supra*), while 91 percent was the lowest amount held to constitute "substantially all" (*Farmers Co-Operative Creamery v. Commissioner, supra* at 269). Based upon the 85-percent test, petitioners do not qualify for exemption because only 84.78

percent of the company's producers in fiscal year 1977 and only 82.52 percent in fiscal year 1978 transacted business with the company. The figures are less favorable with respect to the society; 79.58 percent of the society's producers in fiscal year 1979 and 76.70 percent in fiscal year 1980 transacted business with the society.

The favorable tax treatment afforded cooperatives is intended to benefit the member-producers, not the cooperative as a business entity. *Co-Operative Grain & Supply Co. v Commissioner*, 407 F.2d at 1163. That policy focus provides a reason, if not a compulsion, to strictly construe the "active participation" and "substantially all" requirements of the statute. Tax statutes permitting special exemption are to be strictly construed against the taxpayer. *Helvering v. Northwest Steel Rolling Mills, Inc.*, 311 U.S. 46 (1940); *Luehrmann's Estate v. Commissioner*, 287 F.2d 10 (8th Cir. 1961). Accord (with respect to cooperatives seeking exemption under section 521) *Land O'Lakes, Inc. v. United States*, 514 F.2d 134, 139 (8th Cir. 1975), cert. denied 423 U.S. 926 (1975); *Co-Operative Grain & Supply Co. v. Commissioner*, 407 F.2d at 1162; *Farmers Union Co-Op. Co. v. Commissioner*, 90 F.2d 488, 493 (8th Cir. 1937). In ordinary usage or specialized tax parlance, 85 percent is an appropriate and possibly a liberal meaning of "substantially all," considering the policy objectives of the statute. In other areas of the Code dealing with an exemption from taxation, for example, in the tax-exempt bond area, the regulations contain a 90-percent "substantially all" test with respect to the use of proceeds of bonds issued to provide for certain facilities. Sec. 1.103–8(a)(i), Income Tax Regs. Accordingly, we are in agreement with the recent judicial approval of the 85-percent standard for stock cooperatives. *West Central Cooperative v. United States, supra.*

We do not believe, however, that the eighth circuit intended to support or fashion a rigid standard which would, under all circumstances, not achieve the congressional intent of the statute. If, for example, a cooperative had 90 percent of its shareholders patronize the cooperative for 3 successive years and then shareholder participation dropped to 84.75 percent for 1 year, the congressional intent would not be served by revoking the cooperative's exempt status for the year that participation fell below 85 percent. In such a situation, the

cooperative has not become the focal point or reason for its own existence, thereby being transformed into a business enterprise separate from its shareholders or members. Accordingly, we believe the cooperative would have satisfied the "substantially all" requirement. On the other hand, a cooperative with 78 percent patronization for 3 successive years, and then 84.75 percent for 1 year, does not comply with the "substantially all" test and has not restricted the ownership of its capital stock "as far as possible" to active shareholders. To that extent, we agree with petitioners that a facts-and-circumstances approach should be utilized to temper the possibility of a harsh result that could occur from the use of the bright-line test of Rev. Rul. 73–248, *supra.*

Petitioners argue that *Co-Operative Grain & Supply Co. v. Commissioner, supra,* and *Petaluma Co-Operative Creamery v. Commissioner, supra,* support their argument, but the percentages used therein should not be controlling because the taxpayers therein did not argue, nor did this Court determine, that the cooperatives had restricted their stock ownership, as far as possible, to active shareholders. Petitioners argue that those cases are factually distinguishable because petitioners have attempted to restrict the ownership of their stock "as far as possible" to active patrons. With respect to the company, it reduced the period of nonpatronage from 2 years to 1 year (i.e., the period of time after which a shareholder could be asked to redeem his voting stock because he had not patronized the company during that time). This reduction in time could, arguably, have improved the percentage participation in the company. On brief and by stipulation, petitioners presented schedules showing the increase that would occur if we were to consider and delete those nonparticipating shareholders from the computation who were actually purged from voting membership after the year in question. In some instances, considering subsequently purged shareholders, petitioners would have met the 85-percent test. A close scrutiny of petitioners' schedules reflects, however, that, generally, nonparticipating shareholders were not purged for about 12 to 24 months after the close of the measuring year. Additionally, many nonparticipating shareholders were not purged for as long as 36 months after the close of the measuring year.

The company's failure to purge nonparticipating shareholders until generally 1 to 3 years after the close of the measuring year, in essence, more than negates any benefit that could have enured by reducing their nonparticipation period from 2 years to 1. Petitioners request that we favorably consider their delayed action and permit credit for efforts as much as 36 months later to help them meet the 85-percent test. The case law is clear, however, that current patronage on an annualized basis is the standard. *Co-Operative Grain & Supply Co. v. Commissioner, supra.* Based upon the record in this case, we find that the company has failed to restrict stock ownership, as far as possible, to participating shareholders. The society's bylaws and efforts are even less effective than those of the company, and accordingly, we find that the facts and circumstances of these cases do not warrant variance from the 85-percent standard. In so finding, we disagree with petitioners' attempt to distinguish *Co-Operative Grain & Supply Co. v. Commissioner, supra,* and *Petaluma Co-Operative Creamery v. Commissioner, supra.* In those cases, as here, we considered whether the taxpayers restricted stock ownership to eligible patrons by evaluating the effect of a shareholder's death, a shareholder's move from the cooperative's trade territory, and the effect of joint stock ownership between husband and wife.

Petitioners also urge this Court to include persons who became members of the cooperative by patronizing during the course of each year, but did not become shareholders until after the end of the fiscal year. While such "members" were not shareholders, they were entitled to participate in the management and profits for those years. If we were to include such persons in the computation, the company's percentages would increase to 85.45 percent and 83.26 percent, respectively. Petitioners have not provided the figures nor are we able to compute the percentages with respect to the society by including those nonshareholders who transacted business with the society. Petitioners admit that the society's percentages may not be much improved by adding after-admitted members but argue that the society is 5 to 7 times larger than the company and sheer size alone should be sufficient to provide the basis for a different result. We hold that only shareholders who transact business with the cooperative during the year are to be included each year just as shareholders who no

longer patronize the cooperative must be removed from the computation. Both inclusion and removal of such "members" are determined after the end of the cooperative's fiscal year when the cooperative determines whether such person had sufficient patronage to earn or to lose a share of stock. The test is whether at least 85 percent of a cooperative's capital *stock* is held by producers. This test presumes that the producers are shareholders during the year. See *Co-Operative Grain & Supply Co. v. Commissioner*, 407 F.2d at 1162. Similar types of arguments have been previously raised before this Court and rejected because "A mere continuing business relationship without actual yearly participation is not a sufficient basis upon which to find current *shareholder* participation of business with the cooperative." *Co-Operative Grain & Supply Co. v. Commissioner, supra.* Emphasis added.

## B. 50-Percent-Current-Patronage Test

In addition to requiring that "substantially all" of the shareholders be producers, this Court and the eighth circuit have interpreted section 521(b)(2) to require that the shareholders be current and active patrons. *Co-Operative Grain & Supply Co. v. Commissioner*, T.C. Memo. 1973–164, on remand 407 F.2d 1158, 1160 (8th Cir. 1969). However, neither court quantified this current patronage concept by defining what amount or quantity of business a producer-shareholder must transact in order to qualify as a current and active patron. Petitioners argue that any producer who has transacted *any* or *some* business with the cooperative may be considered an active and current producer of the cooperative during the year. Respondent, on the other hand, argues that a producer can be considered an active or current patron only if he markets or purchases more than 50 percent of his products or supplies through that cooperative during the year relying on Rev. Proc. 73–39, *supra.* We need not decide this quantum of business test because neither petitioner has reached the prerequisite 85-percent test.[11]

---

[11]We note that consideration of this area is fraught with many difficulties and problems. Does respondent contemplate that cooperatives will keep track of shareholders' transactions outside the cooperative in order to police the 50-percent test of Rev. Proc. 73–39, 1973–1 C.B. 502? Would cooperatives effectively serve their congressionally intended purpose if patrons were required by contract to transact a minimum amount of business with the cooperative?

## C. Patronage-Sourced/Nonpatronage-Sourced

All cooperatives, whether exempt or nonexempt, may deduct amounts paid or allocated to their patrons (patronage dividends). Sec. 1382(b). If a cooperative is exempt, such amounts are deductible regardless of whether they are paid out of patronage-sourced or non-patronage-sourced income. Secs. 1382(c)(2)(A) and 1388(a)(3). If a cooperative is not exempt, however, such amounts are deductible only if paid out of patronage-sourced income. *Pomeroy Cooperative Grain Co. v. Commissioner*, 288 F.2d 326 (8th Cir. 1961), revg. and remanding 31 T.C. 674 (1958); sec. 1388(a)(3). Because we have found that petitioners were not exempt cooperatives during the taxable years at issue and because of concessions made by the parties, we need not address whether the company may deduct the grain storage income they distributed to the patrons.

The parties agree that all but $1,752.89 of the company's 1978 grain storage income was patronage-sourced income. All patronage-sourced income was properly deductible by the company without regard to its tax-exempt status. With respect to the $1,752.89 amount that both parties agreed is non-patronage-sourced, the company may not deduct this amount because we have found that the company was not exempt for the taxable years at issue.

To reflect the foregoing and concessions made by the parties,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, GOFFE, WILBUR, CHABOT, NIMS, PARKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, and WRIGHT, *JJ.*, agree with the majority opinion.

KÖRNER and JACOBS, *JJ.*, did not participate in the consideration of this case.

---

WHITAKER, *J.*, dissenting: I do not believe there is any basis in the statute or the regulations thereunder for the adoption of a "bright-line" test at the level of 85 percent as articulated by respondent in Rev. Rul. 73–248, 1973–1 C.B. 295. The majority

opinion effectively adopts this bright-line test and applies it to the facts before us. While arguably the majority felt impelled to reach this result by the rule of *Golsen v. Commissioner*, 54 T.C. 742, 756–758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), and the opinion of the eighth circuit in *West Central Cooperative v. United States*, 758 F.2d 1269 (8th Cir. 1985), affg. per curiam an unreported District Court opinion, I do not agree that approval of Rev. Rul. 73–248 is so required. And certainly *Golsen* does not mandate independent adoption of that test by this Court.

Insofar as pertinent, respondent's regulations provide as follows:

(2) An association which has capital stock will not for such reason be denied exemption (i) * * *, and (ii) if substantially all of such stock (with the exception noted below) is owned by producers who market their products or purchase their supplies and equipment through the association. Any ownership of stock by others than such actual producers must be satisfactorily explained in the association's application for exemption. The association will be required to show that the ownership of its capital stock has been restricted as far as possible to such actual producers. If by statutory requirement all officers of an association must be shareholders, the ownership of a share of stock by a nonproducer to qualify him as an officer will not destroy the association's exemption. Likewise, if a shareholder for any reason ceases to be a producer and the association is unable, because of a constitutional restriction or prohibition or other reason beyond the control of the association, to purchase or retire the stock of such nonproducer, the fact that under such circumstances a small amount of the outstanding capital stock is owned by shareholders who are no longer producers will not destroy the exemption. The restriction placed on the ownership of capital stock of an exempt cooperative association shall not apply to nonvoting preferred stock, provided the owners of such stock are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends. [Sec. 1.521–1(a)(2), Income Tax Regs.]

The statute and regulations have been in effect, substantially unchanged, since the Revenue Act of 1926.[1] In fact, insofar as here pertinent, the regulations have been little changed since the version approved on December 20, 1924. See art. 22, Regs. 65, as amended by T.D. 3658, III–2 C.B. 242. The statute has consistently imposed on cooperatives having capital stock the

---

[1]The legislative history of this statute is fully described in *Co-Operative Grain & Supply Co. v. Commissioner*, 407 F.2d 1158 (8th Cir. 1969), revg. in part and remanding T.C. Memo. 1967–132.

requirement that "substantially all" voting stock must be owned by producers who market through the cooperative.

The term "substantially all" now appears in the Internal Revenue Code over 50 times and is used in regulations over 100 times. In varying contexts, the term has been defined as a fixed percentage ranging from 99 percent (sec. 1.103–15(d)(2), Income Tax Regs.) to a combination of 70 and 90 percent (sec. 1.279–5(d)(2), Income Tax Regs.). Both 85 percent and 80 percent also have been adopted by respondent many times to define "substantially all." If there is any rationale for the varying percentages, it is not readily discernible.

If one concentrated solely on section 521(b)(2), with its emphasis upon voting control, one might logically be led to the congressionally enacted voting control test in section 368(c)(1) which requires "at least 80 percent of the total combined voting power * * * and at least 80 percent of the total number of shares." Rather than focusing on defining "substantially all," however, we should grant great deference to respondent's regulations which are about to acquire "senior citizen" status.[2] The crucial import of those regulations is to be found in the following two sentences:

Any ownership of stock by others than such actual producers must be satisfactorily explained in the association's application for exemption. The association will be required to show that the ownership of its capital stock has been restricted as far as possible to such actual producers. [Sec. 1.521–1(a)(2), Income Tax Regs.]

This is a facts-and-circumstances, not a bright-line, test. The examples given—an officer required to have capital stock in order to qualify and a restriction on the ability of the association to recapture stock of a nonproducer—show that respondent, and we must now presume the Congress, intended that each cooperative should essentially be owned and controlled by its producers, and that "substantially all" was not intended to be reflected as a percentage. The regulations allow that amount of nonproducer ownership, and only that amount, reasonably required by the particular circumstances. Thus,

[2]As stated in *Helvering v. Winmill, 305 U.S. 79, 83 (1938)*:

"Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received Congressional approval and have the effect of law."

the issue which should have been addressed by the majority is whether the cooperatives reasonably justified the extent of stock ownership by nonactive producers.

This Court has in earlier cases recognized the propriety of failing to establish a bright line. We have simply defined outer limits. See *Farmers Co-Operative Creamery v. Commissioner*, 21 B.T.A. 265, 269 (1930), where we held that 91 percent satisfies the requirements of section 521, and *Co-Operative Grain & Supply Co. v. Commissioner*, T.C. Memo. 1973–164, on remand 407 F.2d 1158 (8th Cir. 1969), revg. in part and remanding T.C. Memo. 1967–132, where we held that neither 78 percent nor 72 percent satisfies the requirement. Between those outer limits, at least until respondent promulgated Rev. Rul. 73–248, *supra*, the test was entirely one of facts and circumstances, as demanded by respondent's regulations. While the majority suggests that the 85-percent test is not entirely rigid, the regulations are in fact largely abrogated, first by respondent and now by the majority.

The majority commits another error of policy by according to a revenue ruling substantially the stature normally accorded to a regulation. "[A] 'Revenue Ruling' is an official interpretation by the Service, issued only by the National Office and published in the Internal Revenue Bulletin for the information and guidance of taxpayers, Service personnel, and others concerned." Rogovin, "The Four R's: Regulations, Rulings, Reliance, and Retroactivity—A View From Within," 43 Taxes 756, 764 (1965). As Mr. Rogovin points out, revenue rulings and letter rulings are merely part of respondent's rulings program. While certainly useful, these statements of respondent's position "are not entitled to any particular weight." *Anselmo v. Commissioner*, 80 T.C. 872, 883 n. 13 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The Fifth Circuit has well said: "A ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision." *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971).

The majority speculates (see note 10) that Rev. Rul. 73–248 was issued in response to the evident displeasure of the eighth circuit in *Co-Operative Grain & Supply Co. v. Commissioner*,

*supra,* at the lack of specific guidance in the form of "regulations or rulings." If respondent wished to establish a bright-line test, at 85 or any other percentage, the only appropriate way to do so would be by the promulgation of an amending regulation which would have allowed interested cooperatives to comment at a public hearing. The fixing of a safe harbor or perhaps establishment of outer limits (if wide enough) by revenue ruling may be appropriate since more easily accomplished than by regulation promulgation. In any event, such a bright-line test is justified largely for administrative convenience. Its establishment is an appropriate function for the Congress or the Treasury Department by regulation but not for this or any other Court. The majority simply encourages avoidance of the regulation process.

STERRETT, J., agrees with this dissent.