**FARMERS COOPERATIVE COMPANY (Successor-in-Name to Farmers Co-op Oil Company), Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 86–1831.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1987.

Decided July 1, 1987.

775

HEANEY, Circuit Judge.

Farmers Cooperative Company (Farmers) appeals a decision of the tax court, 85 T.C. 601, that it did not qualify as an exempt cooperative association under Section 521 of the Internal Revenue Code, 26 U.S.C. § 521 (hereinafter section 521), during the 1977 and 1978 tax years because substantially all of its capital stock was not owned by producers who market their products or purchase their supplies through Farmers. We affirm in part, reverse in part, and remand to the tax court.

Farmers is a cooperative incorporated under the laws of the State of Nebraska with its principal office in Platte Center, Nebraska. It is an association organized and operated as a cooperative to market the products of its farmer members and others and to sell supplies to members and others. During the tax years relevant to this case, Farmers' authorized capital stock consisted of 40,000 shares of $12.50 par value common stock. Each shareholder of the common stock was entitled to only one vote regardless of the number of shares owned. In addition to the capital stock, Farmers carried certificates of participation and equity credits on its books. Neither the certificates nor the credits entitled the holder to vote or otherwise participate in the management of Farmers.

Beginning in 1956, the Internal Revenue Service (IRS) recognized Farmers as an exempt cooperative under section 521. In March 1982, however, the IRS notified Farmers of its determination to revoke its exemption for all tax years beginning on or after October 1, 1976. The IRS stated that it did so because it believed Farmers had not adequately limited the ownership of "substantially all" of its capital stock to producers who patronized the cooperative during the tax year as required by section 521(b)(2). On July 2, 1982, Farmers filed a petition for redetermination with the Tax Court. The Tax Court held that, on the basis of the facts stipulated, Farmers did not qualify as a tax-exempt farmers' coop-

Robert C. Guenzel, Lincoln, Neb., for appellant.

Kenneth Greene, Dept. of Justice, Washington, D.C., for appellee.

Before HEANEY and McMILLIAN, Circuit Judges, and WOODS,* District Judge.

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

erative during the tax years at issue. Farmers appeals.

## ANALYSIS

Section 521 provides a tax exemption for qualifying farmers' cooperatives. In order to qualify for the exemption a cooperative must be "organized and operated on a cooperative basis * * * for the purpose of marketing the products of members or other producers * * * or * * * for the purpose of purchasing supplies and equipment for the use of members or other persons." 26 U.S.C. § 521(b)(1). In addition, if the cooperative issues capital stock, it is not entitled to the exemption unless "substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the [cooperative], upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the [cooperative]." [1]  26 U.S.C. § 521(b)(2).

The exemption allowed by section 521 is over and above the exemption allowed for other nonqualifying cooperatives. Even nonexempt farmers' cooperatives can deduct from gross income amounts collected from patrons and allocated and distributed to patrons out of the net earnings of the cooperative. See 26 U.S.C. § 1382(b). Exempt cooperatives may, in addition, deduct amounts paid during the tax year as dividends on capital stock and earnings paid to patrons, on a patronage basis, derived from nonpatron sources. See 26 U.S.C. § 1382(c).

The ability of exempt cooperatives to deduct nonpatronage income allocated to patrons on a patronage basis has often been used by cooperatives to allocate income from government grain storage to their patrons, distributing the minimum amount required in cash and carrying the remainder on its books as a credit. Although this arrangement requires patrons to recognize their full allocation for federal tax pur-

poses, the "flow through" arrangement has enabled cooperatives to accumulate sufficient capital to build grain storage and handling facilities not otherwise possible if the nonpatronage income were taxed at the cooperative level. See Affidavit of Stanley A. Wells, Exhibit 123 pp. 27–28. Such facilities allow the cooperative to exercise greater bargaining power on behalf of member farmers by giving them the power to make larger purchases and sales and to better control the timing of such purchases and sales. Thus, the exemption is one method by which Congress sought to enhance the bargaining power of small farming operations. See Liberty Warehouse Co. v. Burely Tobacco Growers' Co-operative Marketing Association, 276 U.S. 71, 92–96, 48 S.Ct. 291, 295–96, 72 L.Ed. 473 (1928).

In limiting the exemption, however, Congress sought to benefit only the members of the cooperative, not the cooperative as a business entity. Accordingly, Congress granted the exemption only to those cooperatives in which "[a]dvantages * * * accrue to a member of a cooperative * * * primarily because of his patronage with the association and not because of any financial investment he may have made therein." Co-operative Grain & Supply Co. v. Commissioner, 407 F.2d 1158 (8th Cir.1969) (quoting Paul, The Justifiability of the Policy of Exempting Farmers' Marketing and Purchasing Cooperative Organizations from Federal Income Taxes, 29 Minn.L.Rev. 343, 344 (1945)).

It is to this end that section 521 requires a farmers' cooperative to limit the ownership of "substantially all" of its capital stock to producers who market their products or purchase their supplies through the cooperative. The degree to which a cooperative must limit ownership of its capital stock in order to qualify for the exemption, however, is not defined in the Internal Revenue Code or the regulations. [2]  In Co-oper-

---

1. A "producer" is defined as a person who bears the risks of agricultural production and who cultivates, operates, or manages a farm. See Rev.Rul. 67–422, 1967–2 C.B. 217; Rev.Rul. 72–589, 1972–2 C.B. 282.

2. Section 1.521(a)(2) of the Income Tax Regulations states:

    An association which has capital stock will not for such reason be denied exemption * * (ii) if substantially all of such stock (with the

*ative Grain & Supply Co. v. Commissioner*, 407 F.2d 1158, 1164 (8th Cir.1969), Judge Matthes, speaking for this Court, held that qualification for the exemption requires substantially all of the shareholder producers to patronize the cooperative on a current basis. In addition, the Court in *Co-operative Grain & Supply Co.* urged the IRS to promulgate regulations clarifying the requirements of section 521(b)(2). After *Co-operative Grain & Supply Co.*, the IRS issued a revenue ruling stating:

> In deciding whether a farmers' cooperative meets the "substantially all" test of section 521(b)(2) of the Code, all of the capital stock of the cooperative (other than nonvoting preferred) must be counted. Once all of the capital stock has been counted, at least 85 percent of such capital stock should be held by producers before it can be said that the "substantially all" test of section 521(b)(2) of the Code has been satisfied.

Rev.Rul. 73–248, 1973–1 C.B. 295.

This Court has since upheld the 85% test as a reasonable interpretation of the "substantially all" requirement of section 521. *See West Central Cooperative v. United States*, 758 F.2d 1269, 1271 (8th Cir.1985).

In this case, we do not understand Farmers to challenge the 85% test in the revenue ruling. Instead, Farmers challenges the manner in which it was applied. In particular, it argues that two groups were treated erroneously: (1) those who, by sufficiently patronizing the cooperative, became entitled to a share of capital stock during the tax year (Farmers contends that those in this group should have been counted as shareholders for the tax year in which they became entitled to the stock);[3] and (2) those who did not patronize Farmers during the tax year (Farmers argues that those in this group should not have been counted as shareholders).

The consequences of accepting Farmers contentions with respect to each group and each tax year are important. For tax year 1977, the IRS contends that Farmers had 670 shareholders, 568 or 84.78% of whom patronized it during the tax year. Alternatively, Farmers argues that if those who became entitled to a share of capital stock during the 1977 tax year are counted as shareholders (and by definition patrons) it would have had 702 shareholders, 600 or 85.47% of whom patronized it during the year.

For tax year 1978, Farmers' argument with respect to those who became entitled to a share is less helpful. The IRS contends that during tax year 1978, Farmers had 698 shareholders, 576 or 82.52% of whom patronized it. Accepting Farmers' argument as to those who became entitled to a share during the tax year, Farmers would have 731 shareholders, 609 or 83.31% of whom patronized it during the tax year.

Of course, accepting Farmers contention that those who failed to patronize it during the tax year automatically ceased to be shareholders results in 100% of Farmers' shareholders being patrons during the tax year because nonpatrons automatically become nonshareholders. Thus, Farmers would be entitled to the exemption for both tax years at issue.

In support of its argument as to the first group, Farmers contends that under general corporate law principles the right to a share of stock accrues upon performance of the necessary prerequisites (in this case sufficient patronage during the year). Thus, since Farmers could not and has not denied a share of stock to one who became entitled to it, any formalities required for issuance of the share should be irrelevant and the patron counted as a shareholder for the year in which the right to it accrued.

---

exception noted below) is owned by producers who market their products or purchase their supplies and equipment through the association. Any ownership of stock by others than such actual producers must be satisfactorily explained in the association's application for exemption. The association will be re-

quired to show that the ownership of its capital stock has been restricted *as far as possible* to such actual producers. *Id.* (emphasis added).

**3.** It is undisputed that Farmers' tax and fiscal year ends on September 30.

In support of its argument as to the second group, Farmers cites the Court to its by-laws which state: "Only producers of agricultural products * * * within the trade territory of this corporation, who do business with the corporation annually, may own the common stock of this cooperative." Farmers also points out that it regularly took action to "purge" nonpatronizing shareholders from its list of active, voting shareholders and that its by-laws provided a procedure for taking such action.

The IRS responds to Farmers' contentions arguing that, as to the first group, under Farmers' by-laws, entitlement to the stock does not accrue until Farmers has closed its books for the year; determined that a patron has done sufficient business to qualify for stock ownership; the patron has made application for membership; and has been accepted by the board of directors at the annual meeting of shareholders. Since none of these actions could have been taken during Farmers' tax year, the IRS argues that those in this group were properly excluded from the 85% computation.

With respect to the second group, the IRS contends that Farmers' by-laws are not self-executing but require affirmative action to convert nonpatrons' shares to nonvoting stock. Since Farmers failed to determine whether a person's shares should be converted or redeemed for failure to patronize it until after the end of the tax year and since the stock of nonpatronizing shareholders was not normally converted or redeemed until quite some time after the close of the tax year,[4] the IRS contends that Farmers' by-laws are not sufficient evidence of the substantive action required on an annual basis to prevent nonpatronizing shareholders from owning capital shares.

While we agree with the IRS's position that Farmers "cannot permanently perpetuate its exempt status simply by declaring in its articles of incorporation or by-laws that nonpatronizing shareholders are not eligible to continue to own shares in the cooperative," we cannot agree with the alternative it offers to ensure that cooperatives qualifying for the exemption are run for the benefit of their patrons and not for the benefit of their nonpatron investors. Apparently, the government would require Farmers and other similar cooperatives to convert or redeem the shares of nonpatronizing shareholders before the end of the tax year for which the exemption is sought. This approach ignores both practical administrative limitations and the purpose served by the limitation on the exemption.

Common sense tells us that Farmers cannot possibly know whether a shareholder will patronize it during the tax year until the close of business on the last day of the tax year. The stipulated record clearly reflects the practical impossibility of determining which shareholders failed to patronize the cooperative and converting or redeeming their shares during the interval between the close of business on the last day of the tax year and the end of the tax year.[5] Moreover, we can discern no pur-

---

**4.** The stipulated record in the case shows that for the tax year ending on September 30, 1977, of the 102 shareholders who failed to patronize Farmers, none had their shares converted or redeemed within six months of the close of the tax year, one shareholder's stock was converted or redeemed within one year, two shareholders had their stock converted or redeemed within eighteen months, 67 shareholders had their stock converted or redeemed within twenty-four months, and 75 shareholders had their stock converted or redeemed within thirty-six months.

For the tax year ending on September 30, 1978, of the 122 shareholders who failed to patronize the company, four had their shares converted or redeemed within six months, 93 had their stock converted or redeemed within twelve months, 95 had their stock converted or redeemed within eighteen months, 102 had their stock converted or redeemed within twenty-four months, and 117 had their stock converted or redeemed within thirty-six months.

**5.** The affidavit of Stanley A. Wells, admitted in evidence at trial, states:

Even with the best internal controls and reporting systems available, a cooperative must complete its bookkeeping for its year end, get a printout of the last data processing that was done in the last week of its fiscal year and, after that printout is received, compare it with a list of outstanding stockholders to determine if any of those failed to patronize it during the year. Following that the cooperative must update and amend its stockholder list to show who are eligible stockholders.

pose to be served by requiring that which is practically impossible.

The purpose of the limitation on the exemption is to restrict it to those cooperatives organized and operated for the benefit of patrons as patrons and not for the benefit of investors. To this end, the section 521(b)(2) exemption is available only to those cooperatives in which participation in the direction and decision making process of the cooperative is strictly limited to patrons.[6] Of primary importance, therefore, is a shareholder's right to vote. Thus, in addition to the practical difficulties of the standard advanced by the IRS, the standard also ignores the primary distinction between passive investors in the cooperative and shareholders—the right to vote.[7] The standard the IRS suggests has this effect because, for all practical purposes, although the right to vote may accrue or be lost during the tax year, it is normally exercised only at the annual shareholders' meeting that is ordinarily held several months after the close of the tax year.

■ Thus, we hold that, for purposes of applying the 85% test, the relevant consideration is whether the right to vote has actually accrued or been terminated by the time of the annual shareholders' meeting following the close of the tax year. In other words, if a producer who sufficiently patronizes a cooperative during the tax year to become entitled to a share of capital stock is actually entitled to vote that share at the annual shareholders' meeting following the close of that tax year, that producer should be counted both as a shareholder and as a patron for the tax year in which the right to the share accrued. Conversely, if a shareholder, by failing to patronize a cooperative, ceases to be entitled to own a share and thereby actually loses the right to vote at the annual shareholders' meeting following the close of the tax year, that shareholder should not be counted as a shareholder or a patron for the tax year in which the right to the share was lost.[8]

Applying the standard to the stipulated record, we note that the "[s]tatutory language exempting farmers' cooperatives from the full burdens of taxation is to be strictly construed." *Land O'Lakes, Inc. v. United States*, 514 F.2d 134, 139 (8th Cir. 1975) (quoting *Co-operative Grain & Supply Co. v. Commissioner*, 407 F.2d 1158, 1162 (8th Cir.1969); *Farmers Union Co-op*

Even under the best of circumstances, this process takes the period of time between the cooperative's year end and its next stockholders' meeting to update its records and show who is now eligible to vote. Exhibit 123 at p. 14.

6. We note that, in light of the facts in this case, the "substantially all" requirement of section 521 may address a problem that is more perceived than real. During the tax years at issue, the by-laws of Farmers limited ownership of capital stock to one share (par value $12.50). In addition, as in most cooperatives, each shareholder was entitled to only one vote. Finally, under applicable law, the dividend rate of capital shares was limited to the greater of the legal rate of interest in the state of incorporation or eight percent per annum. Given these facts, we find it hard to believe Farmers' capital stock represented a particularly attractive investment for one not interested in patronizing it.

7. Section 521(b)(2) recognizes this distinction by excluding from consideration nonvoting preferred stock. 26 U.S.C. § 521(b)(2).

8. This must be distinguished from those who actually attended the shareholders' meeting and voted. Minutes of the Company's annual shareholders' meeting for the years in issue reflect that of the 94 persons who attended the shareholders' meeting following the close of the 1977 fiscal year, 76 were capital stockholders entitled to vote. Of the 70 persons who attended the shareholders' meeting following the close of the 1978 fiscal year, 67 were capital shareholders entitled to vote.

The actual attendance records of the meetings are not sufficient evidence that a cooperative has taken steps to ensure that control of its affairs remains with its patrons for two reasons. First, we are concerned with the rights of nonpatrons to direct the affairs of a cooperative. The fact that the right may not have been exercised in a specific instance does not mean that the right does not exist or will not be exercised at some point in the future. Second, as a practical matter, unless a cooperative can show that its list of those entitled to vote is updated prior to the annual shareholders' meeting to reflect nonpatrons' loss of voting rights, the statement that a certain percentage of those attending a shareholders' meeting were entitled to vote does not indicate that a cooperative took action to remove the voting rights of nonpatron shareholders.

*Co. v. Commissioner,* 90 F.2d 488, 493 (8th Cir.1937)). Moreover, Farmers had the burden of demonstrating that it is entitled to the exemption. *Farmers Union Co-op,* 90 F.2d at 493. In this light, we consider separately those patrons who became entitled to a capital share during the tax year and those who failed to patronize Farmers during the tax year.

### 1. Patrons entitled to a share

■ With respect to those patrons who became entitled to a capital share during tax year 1977, the uncontradicted affidavit of James A. Beiermann, a manager with Farmers states: "Each of the 31 new shareholders of the Company [Farmers], whose shares had been issued to them on the annual meeting date, were entitled to participate in that meeting and to vote on all matters requiring action by the shareholders." Exhibit 24 at p. 12. Thus, the tax court erred in failing to include in the total number of Farmers' shareholders and in the number of patrons for tax year 1977, those who became entitled to a share of capital stock during that tax year.

With respect to those patrons who became entitled to a capital share during tax year 1978, the record similarly indicates that they were entitled to participate as voting shareholders in the annual meeting following the close of the tax year. Exhibit 24 at p. 31. Thus, they should have been included in the total number of Farmers' shareholders and patrons for tax year 1978.

### 2. Nonpatronizing shareholders

Whether those shareholders who failed to patronize Farmers during the tax year preceding the annual shareholders' meeting could have voted at the meeting presents a more difficult question. The uncontradicted affidavit of James A. Beiermann states:

The Company [Farmers] follows specific procedures with respect to the conduct of its annual meetings so that only shareholders are allowed to vote. Every patron who attends is required to register in at the front door. That patron's name is checked against the Company's *most recent investment listing,* or sharehold-

er list. It is then determined whether the patron is a stockholder and, thus, entitled to vote or whether he is the holder of a certificate of participation and not entitled to vote. This procedure was observed at the annual meeting following the Company's 1977 fiscal year, at the annual meeting following its 1978 fiscal year, and at the annual meeting following each subsequent fiscal year since 1978.

Exhibit 24 at pp. 12–13.

■ That Farmers followed certain procedures in limiting the right to vote at its shareholders' meetings to record owners of capital shares is not, of course, proof that those who failed to patronize Farmers during the fiscal year could not have voted at the meeting. It does no good to follow such procedures if the lists used to determine a person's right to vote do not reflect conversion or redemption of shares for failure to patronize the cooperative. Thus, the question is whether the investment listing referred to in the above quoted passage reflected the cancellation of the voting rights of those who failed to patronize it during the preceding tax year.

Review of the record reveals no evidence that the list reflected such action. To the contrary, the affidavit of Stanley A. Wells stated:

[A]fter the end of its 1978 tax year, [Farmers] again updated its bylaws and added a provision which now enables it to effectively cancel a voting share even though the share has not been physically called in and redeemed. Its bylaws now provide that an inactive patron immediately ceases to be eligible to hold stock or exercise any of the rights or privileges of a stockholder.

Exhibit 123 at p. 12.

Thus, it appears that during the tax years at issue, Farmers believed it could not cancel the voting rights of a nonpatron without first calling in and obtaining physical possession of the nonpatron's stock. The logical conclusion, therefore, is that the nonpatrons would have been included among those eligible to vote on the lists of such persons at the time of the sharehold-

ers' meeting. In sum, since Farmers failed to show that those shareholders who failed to patronize it during the tax year could not have voted at the annual shareholders' meeting following the tax year, the tax court correctly counted such nonpatrons as shareholders for the tax years at issue.

As a final matter, the tax court, due to its disposition of this case, accepted as a patron every person who did business with Farmers during the tax year regardless of the quantity of such business. The tax court expressly reserved questions as to the validity of the position taken by the IRS that section 521(b)(2) requires producers to market 50% of their production or to purchase 50% of their supplies from the cooperative during its tax year to be considered patrons. *See* Rev.Proc. 73-39, 1973-2 C.B. 502. This Court has not squarely addressed this issue.[9] Thus, it is appropriate to remand the case to the tax court for consideration of this issue.

### CONCLUSION

Under the rules set forth in this opinion and accepting (as did the Tax Court) as a patron every shareholder who did business with Farmers during the relevant tax year, we affirm the finding of the tax court with respect to tax year 1978 that Farmers failed to show that 85% of its shareholders were patrons. With respect to tax year 1977, however, we reverse the tax court and remand the case for a determination of the validity and applicability of the patronage requirements found in Rev.Proc. 73-39, 1973-2 C.B. 502.

---

**9.** We note, however, this Court's comment in *Co-operative Grain & Supply Co. v. Commissioner,* 407 F.2d at 1164 n. 10:

> Neither the taxpayer nor amicus has discussed the question of the *amount* or *quantity* of products which currently must be sold or supplies purchased through the cooperative. * * * The Commissioner in brief, however, assumes that *substantially all* of the shareholder-producers must market *substantially*

all of their products and purchase *substantially all* of their supplies through the cooperative. * * * We do suggest, however, that imposition of the standard proposed here by the Commissioner could produce impractical and perhaps oppressive results. We believe the Tax Court, on remand, should resolve this question, if it becomes an issue, by application of a reasonable and realistic standard.